## ALBERT G. LAWSON, The.

[See The John Sanderson, Case No. 7,364.]

═══════

## ALBERT, The JOHN.

[See The John Albert, Case No. 7,333.]

═══════

## Case No. 141.

### ALBERTI v. The VIRGINIA.

[2 Paine, 115.][1]

Circuit Court, S. D. New York. 1840.

ADMIRALTY—JURISDICTION—CONTRACT NOT RELATING TO MARITIME SERVICE.

1. If a charter party embraces stipulations merely of a personal nature, having no relation to a maritime service in the safe carrying and delivery of the cargo, courts of admiralty have not jurisdiction to afford relief for a breach of such part of the contract.

[Cited in Peck v. Laughlin, Case No. 10,-890; Deely v. The Ernest and Alice, Id. 3,735; The Clytie, Id. 2,914.]

2. Still less have they jurisdiction where such stipulations are contained in an instrument distinct from the charter party.

[Cited in Peck v. Laughlin, Case No. 10,-890; Deely v. The Ernest and Alice, Id. 3,735.]

3. The owner of a vessel under charter for the West Indies and a market, agreed by letter that, if a certain price could not be obtained at a designated port, the vessel should proceed to another; which agreement he violated. *Held,* that admiralty had not jurisdiction of the case.

In admiralty. This was an appeal from the district court of the southern district of New York, from a decree dismissing a libel for want of jurisdiction. [Affirmed.]

The libel set forth that Charles Willey, the owner of the brig Virginia, Bethell, master, on the 14th day of March, 1840, chartered said brig to the libellants. This charter party was in the following words:—"This charter party made and entered into, this fourteenth day of March, 1840, by and between Charles Willey of Jacksonville, E. F., owner of the brig called the Virginia, of the first part, and Alberti, O'Neil & Dunbar of Woodstock, E. F., of the second part, witnesseth: The party of the first part agrees to charter to the party of the second part, the said brig for a voyage to the West Indies and a market, and to take a full cargo of pine lumber, two-thirds to be on account of the parties of the second part, one-third on account of said brig and owner. The parties of the second part agree to pay at the rate of fourteen dol-

[Reported by Elijah Paine, Jr., Esq.]

lars per thousand feet freight. It is understood that the vessel is to proceed as soon as practicable to the St. Mary's River, Ga., and there take in a full cargo of lumber in and under deck, to be furnished by the party of the second part. within reach of the vessel's tackles at their mill. The party of the second part are to allow five per cent. commission to the captain for sale of two-thirds of cargo in the West Indies, no other charge to be made on the portion belonging to the charterers. Alberti, O'Neil & Dunbar. Charles Willey."

The libel also stated that the vessel having been loaded pursuant to the charter party, the libellants gave to said Willey a letter of instructions, and to which they referred as forming a part of the charter party, or as explaining the duty of Willey and the master, under the charter party. The following is a copy of the letter. "Woodstock, S. S. Mill, 22d April, 1840. Capt. C. Willey, Brig Virginia—Dear Sir: Two-thirds of the cargo now on board your vessel is on account and in conformity with the understanding had between us. You will proceed to Guyama and dispose of your cargo, provided you can do so at a price covering invoice price and freight. We furnish you a letter of introduction to Mr. G. W. Gifford, who we would advise you to consult in the disposition of your cargo. Should you sell there, please pay over the proceeds of our portion to Mr. G. W. Gifford, and request him to remit by undoubted draft the proceeds to our agents, Messrs. Nesmith & Leeds, New York; should you not sell, proceed elsewhere with a view of effecting sales on the best terms possible; should you not be able to reach our limit (or even, we will consent to say, one dollar less) short of Jamaica, you will please proceed to Falmouth, and there discharge your cargo, which by letter in your possession is consigned to Mr. Samuel Magnus. Should you sell at any intermediate port between Guyama and Falmouth, please remit the proceeds of our portion by undoubted draft to our agents at New York, or should you sell at a port where the proceeds can be invested in produce to greater advantage for our interest than by bills, you are at liberty to do so, with the understanding the freight to New York is to be customary, and that it be consigned to our agents there, advising them of the shipment, that they may have insurance effected. Should you remit by bills, please send the first and second by different vessels to our agents, and bring the third in your own vessel. It is understood five per cent. is all the charge, excepting duty, we will allow on the sale of our lumber; you will please bear in mind the freight is paid here, hence we are to receive the whole sale of our portion of cargo, after deducting the duty and five per cent. commission. Should you feel disposed, and there is an opportunity of doing well at St. Johns, you may substitute that for Guyama for your first port.

Trusting you will find a good market, your ob't servants, Alberti, O'Neil & Dunbar."

The libel further stated that Willey wrote a receipt at the foot of the letter, of which the following is a copy: "I hereby acknowledge to have received, from Alberti, O'Neil & Dunbar, a letter of instructions, of which the foregoing is a true copy, and I promise to comply with its requisitions. Charles Willey."

The libel further alleged that, if the instructions and charter party had been complied with, the lumber would have sold for enough to cover the cost and freight; but that the master, in violation of the charter party and the letter of instructions, and of his duty as master, sailed directly for St. Johns, in the island of Porto Rico, and without making any effort to get the best price he could, or to comply with the letter of instructions, sold the cargo at a great loss, and at a price much less than he would have obtained had he complied with the charter party and letter of instructions. That the libellants had been unable to get any settlement with Willey, and that they claimed of him the invoice cost of their share of the cargo, with the amount of freight they had paid, less commissions, &c. And the libel prayed a condemnation of the record, &c.

The claimants demurred generally and for want of jurisdiction.[2] By the decree of the court, the demurrer was allowed and the libel dismissed with costs. From this decree the libellants appealed.

T. Sedgwick, for appellants.

The points made by the appellants were:

I. The jurisdiction of the district court, as an instance court of admiralty, extends generally to all maritime contracts. 2 Browne, Civil & Adm. Law, 88; The Mary, [Case No. 9,187;] Zarel [Zane] v. The President, [Id. 18,201.] The Thomas Jefferson, 10 Wheat. [23 U. S.] 428; The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175. It is not necessary to review these cases at length. By maritime contracts, our courts have understood contracts relating to the business of the navigation of the sea. Every agreement directly relating to that business has been considered a subject of admiralty jurisdiction.

II. This jurisdiction more particularly embraces charter parties and agreements of an analogous character. Dunl. Adm. Pr. 487; 3 Kent, Comm. (2d Ed.) p. 220; De Lovio v. Boit, [Case No. 3,776;] The Volunteer, [Id. 16,991;] Andrews v. Essex Fire Co., [Id. 374.]

III. The charter party and letter of instruc-

[2] As to the jurisdiction of the district and circuit courts, reference may be made to the following cases in Paine:—The Amiable Nancy, [Case No. 331;] Livingston v. Van Ingen, [Id. 8,420;] Denn v. Harnden, [Id. 4,819;] Lucas v. Morris, [Id. 8,587;] Ward v. Arredondo, [Id. 17,148;] Smith v. Jackson, [Id. 13,064;] Rabaud v. D'Wolf, [Id. 11,519;] Catlett v. Pacific Ins. Co., [Id. 2,517;] The Robert Fulton, [Id. 11,890.]

tions, in this case, are to be considered as forming but one instrument; or the instructions are merely to be considered evidence construing and explaining the terms of the charter party. Thus far the libellants suppose there can be no doubt. Contracts relating to the navigation of the seas are proper subjects of admiralty jurisdiction. Charter parties form one of the largest branches of this class of contracts. The charter party and instructions here are to be taken together in this case as one instrument; and that a charter party or a contract of an analogous nature being an affreightment of a vessel for a maritime service. But we are now met by the objection that the part or subdivision of the contract here complained of as broken, does not relate to maritime affairs. Let us state the matter as strongly as it can be stated against the libellants. It is said that the maritime contract here, viz., to carry the lumber to the West Indies, was fully performed; and that the sale of the goods on land, for a price below that limited, was an act performed by the master as consignee; and that, consequently, the admiralty has no concern with it. This view of the matter has been taken by the district judge, and, therefore, while I insist with the utmost confidence that it is erroneous, I am bound to do so with deference and respect. I am quite ready to concede that in a charter party stipulations might be inserted which would be of a character wholly unmaritime, (if I may so express myself,) and which would give the admiralty no jurisdiction whatever. If the master were made, properly speaking, consignee of the cargo, if it had arrived at its ultimate destination and was landed, and he should then misapply it or its proceeds, I readily admit that no charter party could give the admiralty jurisdiction. If here, after the vessel had arrived at Falmouth, and the cargo were on shore, he had converted it to any improper purpose, the vessel clearly would not then be answerable. But is that this case? What is the contract here? Simply this: To carry this lumber to Jamaica, provided the price of lumber at the intermediate ports does not reach a certain limit. Has that contract been performed? Not at all. The vessel only carried the cargo to Porto Rico. The vessel has not done what she undertook to do. That must always give jurisdiction to the admiralty in rem. It is all very well for defendants in cases like this to chaunt the praises of the trial by jury; but how are we to get at a case like this with a jury, the most clumsy and awkward engine that justice ever invented or condescended to make use of? When shall we find this Florida gentleman, Mr. Willey, within our territories? The jurisdiction of admiralty in personam may be hedged in with propriety, because the person is there given to the custody of a single judge; but in rem, the jurisdiction of admiralty is wholesome, liberal, almost essential to the interests of commerce and to in-

ternational intercourse. What is the basis, the reason of it? Why, merely that the vessel, the thing, the res, by means of which the benefit is obtained, shall stand security to the other party for the protection of his rights. Now, to apply it to this case, what was the consideration upon which the libellants put the lumber on board the vessel? Was it not that it should go to Falmouth, provided the price could not be got short of there? Is not this a contract to which the vessel is bound? What is the breach of the contract? Why, that the lumber was taken out of the vessel at a port short of her destination. Is not this a breach of the contract, and upon altum mare? The master was not to land the lumber at St. Johns to see what the price was, and then to sell it if it reached a certain point—not at all. The libel distinctly charges that he went to St. Johns, and there, without making any effort to get the price limited, sold it. The distinct breach charged is, then, that the master delivered the cargo at St. Johns, instead of Falmouth. It is not that, acting as consignee, he misconducted himself. He never was consignee. The consignee was at Falmouth, and is expressly pointed out in the letter of instructions; and the master could not be consignee, unless the price limited was reached short of Falmouth, and that case never occurred. He never was consignee, therefore, and the very first stick of lumber that he lifted to land it at St. Johns, was lifted in violation of the contract. If he had been authorized to land and wait for the market, then he would have been consignee, and then the precise case would have arisen which, as the counsel for the defendants suppose, presents itself here. But it was not so. He was only authorized to land the cargo short of Falmouth, under certain circumstances. Those circumstances never existed. The landing of the cargo is, therefore, what we complain of. The voyage that the vessel undertook to make has not been completed. It is precisely as if the instructions had run thus: "You will proceed to St. Johns, and if there you find one of our firm to receive the cargo, you will land it; otherwise, you will proceed to Falmouth." Suppose, with the instructions, the master had gone to St. Johns, and there (although the partner whom he was to meet did not appear) he had landed the cargo and sacrificed it, can there be a doubt the jurisdiction of the admiralty would have attached? The counsel treats the matter as if it was the sale that we objected to. So we do. But it is the landing of the cargo for the purpose of sale, that formed the first violation of the contract, and which gives the admiralty jurisdiction.

F. B. Cutting, for respondents, said:

I. The jurisdiction of the instance court of admiralty over all contracts which are of a maritime nature, may be conceded, without prejudice to the demurrer in this case; for there is nothing concerning navigation or maritime service involved in the present controversy. The broad proposition that all claims arising out of a contract or course of dealing which embraces any maritime matters may be enforced in the admiralty, is certainly unsupported by authority, and never would be tolerated by such lovers of the common law as the American community. It is not proposed to go into the ancient discussions touching the extent or limits of admiralty jurisdiction, nor yet to burthen the court with an extended review of modern authorities. Such a course is not necessary in this case. The counsel cites De Lovio v. Boit, [Case No. 3,776,] as an authority. This certainly is not extraordinary, since, although that sentence is understood to have been reversed because no counsel could be found hardy enough to argue in support of it, yet the learned judge who pronounced it seems to think that for this very reason its doctrines are not overturned. 1 Sumn. 554, 555, 565, [The Volunteer, Id. 16,991.] Judge Ware, in his reports—with due submission to the tribunal next in authority above him—actually questions the fact of the reversal. 1 Ware, 152, [Drinkwater v. The Spartan, Id. 4,085.] It will, however, be observed that a policy of insurance relates exclusively to a maritime matter—to wit, the perils of the seas; and if admiralty jurisdiction could be sustained in such a case, it would not affect the present question. Even the great champion of admiralty jurisdiction, Judge Story, does not carry his doctrines to the extent required by the libellants. In the case cited from 11 Pet. [36 U. S.] 182, [The Orleans v. Phoebus,] he states expressly that "the admiralty has no jurisdiction at all in matters of account between part owners," such as an account of the vessel's earnings, or for a part owner's services or advances. In the case cited from 10 Wheat. [23 U. S.] 428; see 6 Cond. R. 173, [The Thomas Jefferson,]—he says: "In the great struggles between the courts of common law and the admiralty, the latter never attempted to assert any jurisdiction except over maritime contracts. See, also, 1 Mason, 509, [The Anne, Case No. 412.] Whether the admiralty shall exercise a jurisdiction coextensive with the most enlarged practice of any court of admiralty under the civil law systems of ancient or modern Europe, or be restrained within the narrow limits into which—in maintenance of the sacred right of trial by jury, that safeguard of private right, and palladium of public liberty, equally dear to Englishmen and Americans—it was forced by the firm and steady action of the English courts of common law, need not, we apprehend, now be decided. In different circuits, certainly, very different views are entertained upon it. Mr. Justice Story, with a zeal and learning which does him great credit, stands forth the champion of the former position; but other judges, with equal ability, and, we think, a more sound con-

ception of the principles of our constitution, and the nature of our judicial system, maintain the latter. Vide Bains v. The Catharine, [Case No. 756;] Ramsay v. The Allegre, 12 Wheat. [25 U. S.] 611; The Grand Turk, [Case No. 5,683;] 1 Kent, Comm. (1st Ed.) p. 352. The fate of this question, whenever presented to the court of dernier ressort, admits of little doubt. To say that the admiralty jurisdiction extends to all maritime contracts, is not advancing a step in the argument; for it remains to be determined what are maritime contracts. It seems to us, that the just limit to this jurisdiction, in respect to contracts, is that it embraces all those that relate to the actual operation of navigating the high seas; to this extent it is beneficial, perhaps necessary, to international commerce. Beyond this, the jurisdiction is wholly useless, and is actually forbidden by law; for, in all other cases, the common law is as competent to give relief to the suitor as a court of admiralty. Judiciary Act Sept. 24, 1789, § 9, [1 Stat. 76.] This would include suits for mariners' wages, for supplies and repairs furnished vessels actually engaged in maritime commerce, marine hypothecations, suits in rem to enforce the payment of freight, and controversies between part owners as to the possession and employment of such vessels; but not a policy of insurance, nor a controversy in relation to the sale of a cargo in a foreign port, by the consignee thereof. The counsel for the libellant cites, and the libel seems framed upon the doctrine contained in, a note to Dunlap's Practice, 488. Without entering into the question whether those cases are correctly decided or not, let it be observed that they are all decided, with some apparent misgivings on the part of the courts as to the question; and yet, they only assert the jurisdiction of the admiralty to enforce the specific lien given, even by the common law, for freight earned by a vessel for transporting goods upon the high seas. Do these cases assert that every commercial adventure entered into by merchants, in which one of the contracting parties owns a ship that is used in some branch of the operation, may be drawn into the admiralty? Surely not. We presume this court would hardly entertain a suit on a policy of insurance, and yet such a suit would possess much more of a maritime nature than the present libel. The general phrase found in elementary writers, that a charter party is a maritime contract, of which a court of admiralty has jurisdiction, unsupported and unexplained as it is by adjudications on the point, is as unsafe and unsubstantial a basis on which to rest this jurisdiction, as the like remark, in the same "authorities," in relation to a policy of insurance. Surely if the jurisdiction now claimed had any rightful existence, some traces of it would be found in actual adjudication. The silence of Westminster Hall is often appealed to as evidence against a common law claim. The silence of the admiralty is evidence here.

II. The present case presents a contract for the carriage of a quantity of lumber to the West Indies, and a market; with a letter of instructions, sent, as the libel states, to whoever should go as master in the vessel, appointing him consignee of the lumber, and prescribing the conduct to be pursued by him in respect to the sale of the cargo, and disposition of the proceeds. The vessel performed her voyage, agreeably to the charter party, to a port in the West Indies, a port indicated to the consignee in the letter of instructions, as a market; and there, on land, acting as consignee of the cargo, the master sold the cargo as he was directed to do by his instructions, but below the prescribed price. This is matter of contract or of tort. If of tort, it was not committed by the master, as master, but as consignee, nor was it committed super altum mare; and, therefore, the instance court of admiralty has not jurisdiction of it, especially in rem against the property of the owners of the vessel. 1 Dunl. Adm. Pr. 50; 2 Browne, Civil & Adm. Law, 144; 2 Pet. Adm. Dec. Append. 74, [Treatise on Masters of Ships, art. 2, Fed. Cas., Append. to last volume.] If it is matter of contract, then, it is for executing, imperfectly and improperly, a contract made on land, whereby the master was to act as consignee of the cargo, to receive it as such in a foreign port, and there sell it. The whole maritime matter of the case, everything belonging to the seas, or constituting any part of the charter party, or contract of affreightment, is performed; but, after the delivery of the cargo to the consignee, at the market or land by him selected, he has been guilty of a departure from instructions in the manner of sale. Suppose the breach of instructions had consisted of a neglect to advise, as to the return of proceeds invested, by which the libellants omitting to insure had suffered a loss. Surely this would not give admiralty jurisdiction in rem, to enforce a claim for damages against the vessel which took out the original cargo. The characters of master and consignee are altogether distinct and independent, and will be so deemed, even where the offices coincide in the same individual. The law will then regard the individual as holding the one office or the other, according to his actual position and employment at the time of the act to be discussed. Per Kent, J., Kendrick v. Delafield, 2 Caines, 72. In this case there can be no doubt on that point; when the master, as consignee, determined to sell at the first port, he acted in his character of consignee; his sale was in the character of consignee. That sale is the act complained of, it is the act of a commercial agent in the land service, having no connection whatever with the navigation of the seas, or any matter maritime, and its legal merits must be tested, by the rules of the

common law, before a jury. The reference in the charter party, to the fact that the master would probably be selling agent, is properly no part of the charter party, as such. If an agreement relative to commerce on land be written upon the same paper with an agreement relative to matters maritime, the jurisdiction over the whole contract would not thereby be conferred upon the admiralty; particularly if the whole matter complained of, and in respect to which the breach occurred, related to the first branch. Even applying to such a case the grasping maxim of chancery, that jurisdiction existing for one purpose, the admiralty may retain it generally, would do the libellants no good; for no breach of the contract is complained of in that part of it which has a maritime aspect. The maritime obligation to carry the goods to the market in the West Indies, which the shipper's consignee should select for its sale, was fully performed. The only object of referring to the sale in the charter party, was to negative the idea of any greater charge than a commission; and that, it will be observed, is to be paid, not to the owner, but to the master: not as freight, but as a commission for selling; it is, by force of that term, a land matter. The shipper need not to have selected the master as his consignee; he was at liberty to select whom he pleased for that office. On the whole, it is respectfully submitted to the court, that the libel does not present a claim of a maritime nature, and that the libel was properly dismissed. The sentence should be affirmed with damages, for the vexation and delay of this appeal.

Before THOMPSON, Circuit Judge, and BRISTOL, District Judge.

THOMPSON, Circuit Justice. This case is brought up by appeal from the decree of the district court, dismissing the libel for want of jurisdiction. The argument of the appellant's counsel seems to assume that the letter of instructions is to be taken as a part of the charter party, and to receive the same construction, and be subject to the same jurisdiction, as if incorporated in the charter party. [See note at end of case.] I by no means mean to admit that if this had been the case, it would not have made any difference with respect to the jurisdiction of the court. If a charter party embraces stipulations purely of a personal nature, having no relation to a maritime service, in the safe carrying and delivery of the cargo, the admiralty jurisdiction of the district court could not reach the case and afford relief for a breach of such part of the contract. But it seems to me that the instructions in this case are entirely independent of the charter party; they bear different dates, and were not executed at the same time. The latter bears date the 14th of March; and the former on the 22d of April, 1840. The charter party is for a voyage to the West Indies, and a market generally; and the instructions limit the delivery of the cargo to certain specified places. But what is more important in the present case, the instructions contain stipulations for services to be rendered on land in relation to the dispositions of the cargo; and besides, the duty and undertaking of the charterer are not left to rest upon his liability growing out of the charter party, but he enters into a special contract in relation to matters contained in the instructions, which afford a reasonable inference that the parties did not understand the charter party and letter of instructions as one instrument. But this is not the real and fatal objection to the jurisdiction of the court. The nature of the services stipulated to be rendered, which form the subject-matter of the relief sought by the libel, does not belong to the admiralty jurisdiction of the court. It was not of a maritime character; it did not relate to the safe carrying and delivery of the cargo, or anything to be done upon the high seas, but related entirely to the sale of the cargo and matters to be done after the termination of the charter party and safe landing of the cargo. The whole complaint in the libel rests upon alleged violations of these instructions by selling the cargo at a less price than was thereby limited. This is matter belonging entirely to courts of common law. I am accordingly of opinion that the decree of the district judge ought to be affirmed.

NOTE. [from original report.] "The general rule which our courts of law have adopted in the construction of this, as well as other mercantile instruments," says Mr. Abbott, (Shipp. p. 250,) "is, that the construction should be liberal, agreeable to the real intention of the parties, and conformable to the usage of trade in general, and of the particular trade to which the contract relates." "If by the terms of the charter party," says Mr. Abbott, (Shipp. p. 376 et seq.,) "a particular number of days is stipulated for the delivery, either generally or by way of demurrage, the master must wait the appointed time for that purpose, reckoning the days from the time of the ship's arrival at the usual place of discharge in the port, and not at the port merely. These charges are in ordinary cases primage, and the usual petty average, as expressed in the bill of lading; in case of any loss that became the subject of general average, the civil law imposed upon the master the duty of adjusting and settling such average, and obtaining from the owners of the cargo saved the sums to be paid as a contribution to the loss, and allowed him to detain the cargo for that purpose. This power of detaining the cargo is also given by the laws of Oleron, and by the French ordinance. It is said to be the practice in this country, in the case of a general ship, for the master to take security from the merchants before he delivers the goods, for payment of their shares of this contribution when the average shall be adjusted. If goods are conveyed in pursuance of a charter party, the right of detention for the freight may depend upon the terms of the particular contract: where there is no special contract, as in the case of a general ship, the master is not bound absolutely to part with the possession of any part of his cargo, until the freight and other charges, due in respect of

such part, are paid. Valin informs us that the entire contents of a single bill of lading are to be considered as one part, although consisting of very different articles, but that the contents of one bill of lading are not bound to the payment due for the contents of another bill of lading, although consigned to the same person. In this country, however, it has been held, that the master may detain any part of the merchandise for the freight of all that is consigned to the same person, which seems to be a more reasonable and convenient rule. The master, however, cannot detain the goods on board the ship, until these payments are made, as the merchant would then have no opportunity of examining their condition. By the ordinance of Wisbuy, and also by the French ordinance, the master may seize and detain the goods in the lighters, or barges, which are [to] transport them to the quay, and by the former he may detain the lighters by the ship's side. Cleirac, in his commentary on the laws of Oleron, says that the same power is given by the ordinance of Philip the Second and by the Consolato del Mare, and that the latter allows him to detain goods equal in value to four times the amount of the freight. The ordinance of Rotterdam allows the master to detain the goods for his freight, but requires him to unload and take care of them, that they may not be diminished or spoiled. In England the practice is to send such goods as are not required to be landed at any particular dock to a public wharf, and order the wharfinger not to part with them till the freight and other charges are paid, if the master is doubtful of the payment. And by the law of England, if the master once parts with the possession out of the hands of himself and his agents, he loses his lien or hold upon the goods, and cannot afterwards reclaim them. If the master land his goods at any particular wharf or dock, in obedience to an act of parliament, he does not thereby part with his lien. If goods are landed or sold by the officers of the customs, the freight not having been paid, the produce of the sale is to be first applied to the payment of the freight."