THE RIPON CITY.

(Circuit Court of Appeals, Fifth Circuit. May 15, 1900.)

No. 868.

1. ADMIRALTY JURISDICTION—MARITIME CONTRACTS.

A clause of a charter party giving the charterer the agency of the ship in case she is in general average during the term of the charter creates a maritime contract, which may be enforced in a court of admiralty.[1]

2. SHIPPING—MUTUAL LIENS OF VESSEL AND CARGO.

The mutual lien between vessel and cargo, resulting from a contract of affreightment, exists, as against the ship, only in favor of the cargo itself, and does not extend to agreements in the charter party which do not relate to the cargo.

3. MARITIME LIENS—BREACH OF CHARTER—REFUSAL TO PERMIT RENDITION OF SERVICES.

Under the general maritime law, there is no lien upon a ship for damages resulting from a breach of a provision of a charter making the charterer the ship's agent for the adjustment of general average, and, in the absence of an express provision for a lien in the charter, a suit in rem cannot be maintained against the ship to recover such damages because of a refusal to permit the charterer to act as such agent.

4. SHIPPING—CONSTRUCTION AND OPERATION OF CHARTER—PROVISION MAKING CHARTERER SHIP'S AGENT.

A charterer had no interest in the cargo, and his only interest in the voyage was in the excess of freight earned over the amount of the hire

---

[1] As to admiralty jurisdiction in matter of contract, see notes to The Richard Winslow, 18 C. C. A. 347, and Boutin v. Rudd, 27 C. C. A. 530.

stipulated for in the charter. [6] The charter contained a provision that, in case the ship was in general average, "the agency and the settlement thereof" should remain with the charterer or his agents. After the ship had loaded and started on her voyage she took fire, and returned to the port of sailing, where, the charterer not being at such port and having no agents there, the master employed another agent, who took charge of saving the vessel and cargo, and continued to perform such services as were required on behalf of the vessel resulting from the disaster. *Held*, that the master was justified by the emergency in making such employment, and that he did not violate his duty in refusing to discharge such agent when the charterer appeared two days later, and demanded that the ship be placed in his charge, as the result of such action would have been to fasten double liens on the ship for one set of services.

**5.** SAME—LEGALITY OF PROVISION OF CHARTER.

A provision of a charter which would authorize the charterer, as the ship's agent, in case of her taking fire, to assume entire charge of her, and of the matter and means of extinguishing the fire, the unloading and reloading of cargo, and otherwise performing the duties which under the maritime law devolve on the master, is void, as against public policy.

Appeal from the District Court of the United States for the Southern District of Georgia.

This is an appeal from a decree in admiralty in favor of the libelant for the sum of $1,000, with interest and costs. The action is in rem for breach of a special clause in a charter party, to wit: "The drafts for difference in freight and for disbursements are to be insured by the charterers against general average and other marine risks incidental to the interest, and in case steamer is in general average at port or ports of loading, or on the voyage, or at port or ports of discharge, the agency, and settlement thereof, shall remain with the charterers or their agents." The charter party, among other provisions usual in such instruments, contained the following concerning liens: "Any difference in the amount of freight between the bills of lading (and the drafts for disbursements referred to below) and this charter party to be settled at port of loading before sailing,—if in favor of vessel, by cash at current rate of exchange, less insurance; if in favor of charterers, by usual draft of master, payable three days after arrival at port of discharge, or sixty days after date, whichever occurs first, to the order of the charterers or advancers; and the agents, with the consent of the owners, do hereby authorize the master to sign such drafts, and said drafts shall be a lien against the freight, taking precedence of all other claims. Freight payable on 'through' bills of lading from interior points, and on the usual ship's bills of lading, shall (subject to the steamer's lien thereon for chartered freight, and the lien of the drafts of the master and the rights of the holders thereof for difference in freight and [or] disbursements), belong exclusively to the charterers, and shall be collected by their agents at port of discharge. Cargo shipped on 'through' bill of lading from interior points, and for which no ship's bill of lading, but only a 'master's receipt,' is taken, it is understood and agreed that the cargo described in the 'master's receipt' shall be delivered at the port of discharge upon presentation of the said 'through' bill of lading, provided that the particulars agree with those stated in the triplicate 'master's receipt' held by the master. The master shall, if required, give the customary draft on the consignees for whatever inland railway charges are collectible from the receivers of the cargo, as shown on bills of lading and manifest, and said draft shall be a lien against the vessel and her freight. All cargo on board under this charter not claimed by bills of lading shall belong to the charterers, and is to be delivered to their agents at the port of discharge, without any claim by the steamer, except for freight as above mentioned, after shorts are provided for." "Cash for steamer's ordinary disbursements at port or ports of loading to be advanced to the master by charterers, at current rate of exchange, steamer paying two and one-half per cent. commission thereon and cost of insurance, and the master to give the usual draft, payable three days after arrival at port of discharge, or sixty days after date,

whichever occurs first, for the amount of such disbursements, to the order of the charterers or any other parties advancing the said money; and the agents, with the consent of the owners, do hereby authorize the master to sign such draft, and said disbursements and said drafts shall be a lien against the vessel and freight, taking precedence of all other claims." "Charterer's liability under this charter to cease on cargo being shipped, but the owners or master of the steamer to have an absolute charge and lien upon the cargo and goods laden on board for freight."

The libel pleads a charter party of the British steamship Ripon City, for a voyage to the Baltic, dated the 3d of October, 1896, and alleges that the steamer loaded cargo at Savannah, and departed from that port for Reval, on November 16, 1896; that about 100 miles out fire was discovered, and the vessel put back, arriving in Savannah on November 17th; that the master returning in this distress took no steps to notify the libelant in Philadelphia that the vessel had put back, and instead put the ship and cargo in the charge of the firm of J. F. Minis & Co., of Savannah; that on the 17th of November libelant cabled to the owners in England, requesting that the vessel be put in his hands as agent, and telegraphed also to the master in Savannah to take no action except what was absolutely necessary until the libelant arrived there; that libelant proceeded from Philadelphia to Savannah, arriving on Thursday, the 19th of November, and was then informed by the master that he would not permit libelant to take charge of the agency, since the vessel was already in charge of Messrs. Minis & Co.; and that libelant had tendered his services as agent, offering from day to day to act as such, and to furnish and disburse all sums of money necessary for the vessel, which offers had been steadily and persistently refused by the master and owners, "so that the libelant has not been permitted at any time to enter upon the performance of such duties as agent." As damages, the libelant claimed $2,500 for services that he was prevented from performing, $500 for unnecessary trouble and expense incurred in attempting on his part to carry out the charter-party stipulations, with $1,000 for further damage incident to the breach of the charter party, causing the libelant to employ counsel and file a libel for his protection.

The libel was filed on December 14, 1896, and process issued, upon which the Ripon City was attached. Upon the return of process, the master appeared, filed claim, and excepted to the libel on the ground that the allegations thereof did not disclose any admiralty and maritime lien upon said vessel to found an attachment in rem. The various items of damages were also excepted to. After hearing, the exceptions were overruled.

The respondents thereupon answered, setting forth that it was the duty of the libelant to present himself or be represented by a competent agent at the port in which the said steamer. in case of distress, should be in general average, so that the steamship should be enabled to have the immediate benefit of such agency; that the Ripon City returned on fire, the sides of the engine room and bulkheads being terribly heated, and signals of distress hoisted at Tybee; that a tug met the returning steamer with a member of the firm of J. F. Minis & Co., who had represented the libelant in the original loading; and that as the vessel was burning fiercely, and, with the cargo, was in imminent peril, in the emergency and in the interest of all concerned the master requested the firm of J. F. Minis & Co. to take charge. A detailed statement of the services of the said firm followed in regard to extinguishing the fire, employment of tugs, contract with stevedores, surveyors, discharge and storage of the damaged cotton; all of which had been accomplished before the libelant had come on the scene. The answer further alleged that, if the master had been obliged to wait until he had heard from the libelant before taking steps to protect the vessel, it would have been destroyed, with her cargo. The answer admitted that on and after the 19th of November the libelant did offer to proceed as agent, which services were declined.

On the trial it appeared that Mr. Wilson prepared his own form of charter party, with his name conspicuously printed at the top. and that this special clause giving him an agency in case of average is a novel provision of his own devising. He has incorporated it in charter parties for the last six or seven years. The libelant was not the owner nor the shipper of the cargo of the

Ripon City. His function appears to have been that of a middleman, who merely engages tonnage by lump-sum charter, and then turns over the contract to the responsible merchants.—in this case, to Messrs. McFadden & Bro., of Philadelphia, who employed Messrs. J. F. Minis & Co. as agents in loading the ship. The libelant had no part in loading the ship after he turned the contract over to McFadden & Bro., but the appointment of Messrs. Minis was known to the libelant and agreeable to him. On leaving Philadelphia to come to Savannah after the fire, Mr. Wilson had secured the special agency for the cargo interests of the Ripon City. Testimony was given that it was inconsistent for the interests of cargo underwriters and shipowners to be represented by one and the same person in the average. Much testimony was taken tending to establish the matters propounded in the libel and alleged in the answer, but the bulk of it was in relation to the manner in which the Ripon City and her cargo was handled from the discovery of the fire, and in the methods followed in extinguishing the same; the libelant, Wilson, contending and seeking to prove, by experts who had handled cotton fires under his instructions, with steam, that it had simply been flooded with water in the usual way, to the great loss and damage to all concerned, instead of being extinguished by the more modern, economical, and efficacious mode, namely, by the application of steam mainly, with as little water as possible.

The court held, on final hearing, that, after the ship had entered upon the performance of the charter party by loading cargo, the charterer had a lien in rem for the breach of any stipulations of this contract, and that in the emergency the master acted rightfully for the common interest in the employment of Messrs. Minis & Co., saying: "The emergency was immediate. I do not doubt that but for the prompt assistance, like that rendered by Mr. Minis, the cargo and the ship would have been destroyed. It was then the duty of the master to secure that assistance, and this he did by the employment of experienced and competent agents who acted for him. Minis & Co. are not parties to this proceeding, but the services they rendered were in fact services which the charterer, if on the ground himself, must have rendered." The court further concluded that libelant, on reaching Savannah, had a right to settle with Messrs. Minis & Co. for the work already done, and then take from them the agency of the ship. As the libel estimated the entire services at $2,500, the court inferred that Minis had already earned $1,500, and awarded the libelant a decree for $1,000 as his recovery.

The claimants appealed to this court, and assigned error as follows: "(1) That the court erred in deciding that a libel in rem was the appropriate remedy for the wrongs alleged by said appellee in his said libel; (2) that the court erred in not dismissing the libel filed in said case on the ground that there could be no lien for services not rendered; (3) that the court erred in finding that any sum was due to the libelant in said case; (4) that the court erred in finding that the vessel having been in peril, and the master having, in the exercise of his duty, employed an agent, the said agency should have been revoked, and the interest of the vessel turned over to the libelant, after most of the services had been already rendered by another, and the libelant had assumed antagonistic relations to the respondent; (5) that the court erred in overruling the exceptions filed in said case, and erred in finding against any one of the contentions therein set forth."

Harrington Putnam and Walter G. Charlton, for appellants.

William Gerrard, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

After stating the case as above, the opinion of the court was delivered by PARDEE, Circuit Judge.

The clause of the charter party which is the basis of this suit so far relates to the rendition of maritime services that it may be called a maritime contract, and, as to its enforcement, held to be within the jurisdiction of the admiralty; but whether, to recover damages for the breach of the contract, the libelant can proceed in rem, and cause

the seizure of the ship, is another question. To warrant the seizure of the ship as the thing indebted, the libelant must have a lien on the ship to the extent of his damages. It is clear that he has no express lien. The charter party expressly contracts for and preserves a lien on the freight for the difference in amount of freight as shown by the bills of lading and the freight agreed upon in the charter party, a lien on the ship and freight for inland charges and ship's disbursements, and a lien in favor of the ship for the freight on the cargo and goods laden on board, but gives no other liens; wholly omitting the usual provision where a general lien is given to carry out the provisions of the charter party, to wit: "To the true and faithful performance of all and every of the foregoing agreements we, the said parties, do hereby bind ourselves, our heirs, executors, administrators, and assigns, and also said vessel, freight, tackle, and appurtenances, and the merchandise to be laden on board, each to the other, in the penal sum of estimated amount of freight." Expressio unius est exclusio alterius. It follows that, if the present libelant has a lien, it must be because allowed and provided under general admiralty and maritime law. "Admiralty and maritime liens are stricti juris, and are not given by implication." Vandewater v. Mills, 19 How. 89, 15 L. Ed. 554.

Mr. Justice Curtis gives the rule applied in the United States courts as follows:

"For I understand it to be a settled rule that privileged liens constituting a jus in re, accompanying the property into the hands of bona fide purchasers, and operating to the prejudice of general creditors, are matters stricti juris, which cannot be extended from one case to another argumentatively, or by analogy or inference. They must be given by the law itself, and the case must be found described in the law. Privilegia, cum sunt stricti juris, nec extendi possunt de re ad rem, nec de persona ad personam. 1 Boulay Paty, Cours de Droit Com. et Mar. p. 36; Emerigon, Contrat a la Grosse, c. 12, § 1. Even when the court may be of opinion that the law might be beneficially extended to include cases not described in its terms, it must be left to the legislative power so to extend it. This is even expressed by Pardessus (3 Droit Com. pp. 597, 598), when reasoning on the policy of allowing a privilege for premiums of insurance. 'Analogy cannot afford a decisive argument, because privileges are of strict right. They are an exception to the rule by which all creditors have equal rights in the property of their debtor, and an exception should be declared and described in express words. We cannot arrive at it by reasoning from one case to another.'" The Kiersage, 2 Curt. 421, 424, Fed. Cas. No. 7,762.

It is settled with substantial unanimity that unexecuted maritime contracts carry no lien. See, as to affreightment, The Freeman v. Buckingham, 18 How. 188, 15 L. Ed. 341, and Vandewater v. Mills, supra; towage, The Prince Leopold (C. C.) 9 Fed. 333; furnishing supplies, The Cabarga, 3 Blatchf. 75, Fed. Cas. No. 2,276; wages, 1 W. Rob. Adm. 89.

In some instances, where services are rendered or supplies are furnished, no lien follows; for, by the maritime law, the master has no lien on the ship even for wages, nor the ship's husband any lien. See The Orleans v. Phoebus, 11 Pet. 184, 9 L. Ed. 677; Norton v. Switzer, 93 U. S. 365, 23 L. Ed. 903; The Larch, 2 Curt. 428, Fed. Cas. No. 8,085; The Shortcut (D. C.) 6 Fed. 631; The Daniel Kaine (D. C.) 35 Fed. 787; The Nebraska, 21 C. C. A. 448, 75 Fed. 599.

Conceding that the libelant in this case had a valid contract with the ship to employ his services in and about the affairs of the ship in case of general average, and that the master intentionally violated the contract, and refused to employ libelant, to his damage, still it seems clear, on general principles, that no lien on the ship resulted.

It is, however, contended that as the contract to employ libelant's services was one of the provisions of a charter party, contracting for the affreightment of the ship, which contract of affreightment was executed by the delivery and acceptance of cargo duly loaded, and the ship begun her voyage under said contract, a lien resulted; and reliance is had upon the well-settled proposition that after cargo is delivered the ship is bound to the cargo, and the cargo is bound to the ship, for the full performance of the contract. The libelant was not the owner, nor shipper, nor consignee of the cargo of the Ripon City. His sole interest, after the Ripon City was loaded and started on her way, was to be employed as the ship's agent in the matter of general average resulting from the fire which broke out on board. His employment or nonemployment in no way affected the ship's liability to the cargo. If employed, it was to be for the ship, and, it may be presumed, if he had been employed his services would have benefited the ship; but it can hardly be pretended that his employment to represent the ship in general average could or would have been in the interest of the cargo, if, for no other reason, because in general average the interests of the ship and those of the cargo are adverse. That the ship is bound to the cargo, and the cargo bound to the ship, for the fulfillment of the contract of affreightment, is in all maritime codes, and we may examine text-books and adjudged cases to see how the principle has been applied, controlled, and limited.

Conkling, in his treatise on Admiralty, says:

"It may be safely said, therefore, it is presumed that in this country the rule declaring the liability of the ship to the merchandise, and of the merchandise to the ship, is practically, as well as theoretically, true. As it is here interpreted and applied, it imports that the freighter has a lien on the ship and freight for the safe conveyance and delivery of his goods according to the contract under which they are shipped; that the owners, upon the fulfillment of their engagement, have a lien on the goods for their freight; and that these liens may be enforced by admiralty process in rem." Volume 1, p. 166.

In The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772, the supreme court of the United States said:

"Undoubtedly the owner of the cargo has a lien, by the maritime law, upon the ship for the safe custody, due transport, and right delivery of the same, as much as the shipowner has upon the cargo for the freight, as expressed in the maxim, 'Le batel est oblige à la marchandise et la marchandise au batel.' Subject to the exception that the lien of the shipowner may be displaced by an unconditional delivery of the goods before the consignee is required to pay the freight, or by an inconsistent and irreconcilable provision in the charter party or bill of lading, the rule is universal, as understood in the decisions of the federal courts, that the ship is bound to the merchandise, and the merchandise to the ship, for the performance on the part of the shipper and shipowner of their respective contracts. Shipowners contract for the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo contracts to pay the freight and charges, and to the fulfillment of their contract

the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement."

Judge Ware, whose admiralty decisions are of very great authority, expresses himself to the effect: "The reciprocal lien exists only between the goods and the carrier." The Drinkwater v. Spartan, 1 Ware, 149, Fed. Cas. No. 4,085. The vessel is liable in specie to the shippers. The Phebe, 1 Ware, 263, Fed. Cas. No. 11,064. The ship is, by operation of law, hypothecated to the shippers for any loss they may sustain from the insufficiency of the vessel or the fault of the master and crew. The Casco, Davis, 184, Fed. Cas. No. 2,486. A lien on the vessel is called by Lord Tenterden "a security to the merchant who lades goods on board." See Abb. Shipp. 122. In the Code de Commerce there are two articles that deal with the subject, as follows:

"280. Le navire, les agrès et apparaux, le fret et les marchandises chargés sont respectivement affectés à l'exécution des conventions des parties."

"191. Sont privilégiées et dans l'ordre ou elles sont rangées, les dettes ci-après désignées: * * * 11° Les dommages-intérêts dus aux affréteurs pour le défaut de délivrance des marchandises qu'ils ont chargées, ou pour remboursement des avaries souffertes par les dites marchandises par la faute du capitaine ou de l'équipage."

In 1 Traité de Droit Maritime par Lyon-Caen & L. Renault, pp. 559, 560, we find the following:

"Privilege of the Charterer. The privilege granted by the law to the charterer upon the ship does not secure all the charterer's claims against the owner, as might be inferred by the provision of article 280 that the ship, its tackle and apparel, the freight, and the goods laden, are, respectively, liable for the fulfillment of the conventions of the parties. Article 191, subd. 11, restricts the privilege to the damages due to the charterers by failure in delivering the goods which they have loaded, or for recovery of the damages which the goods have sustained by fault of the master or crew. Privileges are matters of strict law. The charterer is not privileged for the damages due by reason of delay occasioned by fault of the owner, or by those for whom he is liable."

In respect to the contention that the maritime lien resulting from a contract of affreightment extends to all agreements in a charter party, whether relating to cargo or not, Mr. Justice Thompson says:

"If a charter party embraces stipulations purely of a personal nature, having no relation to a maritime service, in the safe carrying and delivery of the cargo, the admiralty jurisdiction of the district court could not reach the case, and afford relief for a breach of such part of the contract." Alberti v. The Virginia, 2 Paine, 115, 128, Fed. Cas. No. 141.

It seems to be text-book law that there is no lien for dead freight, i. e., unliquidated damages under the name of freight. 1 Pars. Adm. 292; Macl. Shipp. 435. Indeed, it has been so held in many English cases where the charter party expressly stipulated for a lien for dead freight. Id., and notes. And it is the same for money in the name of freight, stipulated to be paid in advance. Id. The learned judge in the court below maintained the proceeding in rem in this case on general principles, and cited in support thereof several decisions and opinions of the supreme court of the United States, to wit: Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. 344, 12 L. Ed. 465;

Morewood v. Enequist, 23 How. 493, 16 L. Ed. 516. These cases were proceedings in personam where was discussed the general jurisdiction of the admiralty courts over maritime contracts, and the particular question as to whether a lien was given by the general maritime law to cover every stipulation in a charter party, or even to cover every maritime contract, was not before the court nor discussed. The learned judge also cited a number of cases arising in the circuit and district courts, and we find many others in the brief filed by the learned counsel for the appellee. So far as we have been able to examine these cases, we find that no one of them involved the question here pending, and, while we do not question that these cases were correctly ruled, we do not feel called upon to reconcile all the expressions used in the several opinions with our own views on the subject. We are satisfied that for the damages which libelant may have suffered by the failure of the master of the ship to employ his services, as propounded in the libel, he has no lien, either by contract or under the general maritime law, and therefore we conclude that there was error in the court below in overruling the exceptions to the libel in rem.

On the merits of the case, we agree with the court below in holding that when the fire broke out on board the Ripon City the libelant was in no position to have afforded assistance to the master; that the emergency was immediate, and that the master properly acted in the employment of experienced agents to assist him, and in making contracts looking to the preservation of the ship and cargo. But we do not agree that when the libelant arrived in the port of Savannah, after the above steps had been taken by the master, and demanded the discharge of the agents theretofore employed and the employment of himself, it was the duty of the master to comply with his request. The result of this action would have been to fasten double liens on the ship for one set of services.

We do not undertake to determine exactly the meaning of the clause of the charter party which is the basis of libelant's suit. As propounded in the libel, and as contended for in argument, to wit, that immediately upon the ship's taking fire the libelant had the right under his contract to take entire charge of the ship, and of the matter and means of extinguishing the fire, loading and unloading cargo, and otherwise performing the duties which, under the maritime law, devolve upon the master, we are satisfied it is contrary to public policy. The duty of preserving the ship and cargo, and of protecting the lives of people aboard, devolves on the master, and by express statutes the owners of no English or American steamship can employ as a master any but a duly-qualified and licensed seaman, and any contract which undertakes to set aside the master, and to put in charge of a going steamship any unlicensed person,— no matter how well qualified otherwise, or how much interested in ship or cargo,—ought to be held void in any court of admiralty.

The decree of the district court is reversed, and the cause is remanded, with instructions to dismiss the libel.