RICHARD et al. v. HOLMAN et al.

(District Court, D. Maryland. June 11, 1903.)

1. SHIPPING—BREACH OF CHARTER—DAMAGES RECOVERABLE.

The fact of a recharter by the original charterer of a vessel to carry a cargo of grain at a specified rate, which it does not appear was contemplated by the owners at the time of making the contract, and of which they had no notice or knowledge, cannot affect the measure of damages recoverable for their failure to deliver the vessel, so as to entitle the charterer to recover the profit he would have made on the recharter, where freights had' declined prior to the time when the vessel was required to be tendered, and the market rate was then definitely less than the charter rate, so that under the established rule no substantial damages were recoverable.

2. ADMIRALTY JURISDICTION—MARITIME CONTRACTS.

Claims for commissions for obtaining a charter and for an attendance fee, stipulated for in the charter, are not maritime, nor within the admiralty jurisdiction.

In Admiralty. Suit to recover damages for breach of charter party.

Robert H. Smith, for libelants.

Convers & Kirlin and Brown & Brune, for respondents.

¶ 2. Admiralty jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347, and Boutin v. Rudd, 27 C. C. A. 530.

· MORRIS, District Judge. The respondents were the owners of the British steamship Kestor, and by charter party dated August 9, 1897, chartered to the libelants a steamer, not named, guarantied of capacity of 13,500 quarters, 10 per cent., more or less, to carry a cargo of grain from Philadelphia, Baltimore, Norfolk, or Newport News, one port only, to certain ports of the United Kingdom, for orders, at 3s. 3d., or 3s. 6d., per quarter, according to the port to which ordered. Lay days not to commence before January 15, 1898, with option to charterers to cancel the charter if the steamer was not ready for cargo at loading port on or before February 15, 1898. It was stipulated that the name of the steamer to fulfill the charter was to be declared on or before January 1, 1898. On October 26, 1897, by cable from London, the steamship Kestor was declared. The respondents, because of delays in intermediate voyages in which they employed the Kestor, did not send her out to fulfill the charter, as by reason of the delays she would not have been able to reach the loading port by February 15th, the canceling date stipulated in the charter party. On January 20, 1898, the owners gave notice that she would not be able to catch her canceling date, and on February 1, 1898, they gave distinct notice that they would not send the steamer, and that the charterer might charter against them. On February 3d the libelants cabled that they insisted on fulfillment of the charter, and would only agree to cancel on payment of £200 and their commission on the charter.

It cannot be denied that freights fell between the date of the making of the charter and the date when the steamer should have been tendered. The market rate on February 15th was from three to six pence per quarter lower. The libelants, however, show that on November 20th they rechartered the steamer to the E. B. White Grain Company at an advance of one penny halfpenny per quarter, which would have yielded them about $409, besides their commission for effecting the original charter, agreed to be paid to them in the original charter, and an attendance fee.

Are the libelants entitled to recover as damages this loss on the recharter? There is nothing said in the charter party with regard to rechartering or assigning the charter. No notice of any kind was ever given to the owners of any intention of the charterers to recharter, and no notice was ever given that they had rechartered. If the libelants had not rechartered, the measure of damages would have been the difference between the charter rate and the market rate, and as the market rate was distinctly lower at the date for fulfillment of the contract the libelant could recover only nominal damages.

Does a recharter, which it does not appear was contemplated by the owners when they made the contract, and of which they never had notice or knowledge, change the rule with regard to the measure of damage? I do not think so. The general rule that the damage is measured by the difference between the contract price and the market price at the breach of the contract, where there is an ascertainable market price, is a simple and fair rule, easily applied, and it

should not be disregarded except where it is plain that some other element of damage was within the contemplation of the parties making the contract, and that the contract was made with reference to it.

When there is no market price, then resort is, of necessity, had to other elements of loss; and where the contract is made with reference to specific purposes or circumstances, known at the time, a different rule may result from the probable and natural consequences of a breach. The market rate of payment for grain charters of a like character to the present one is as well fixed and ascertainable as the prices of grain and other merchandise, and there is no question but that at the time of the notice from the respondents that they would not send the Kestor and at the canceling day there was a substantial decline from the contract rate.

There is no proof of what was actually done with regard to the cargo intended to have been shipped by the Kestor. The libelants' manager testified that they notified the E. B. White Grain Company, and testified in a general way that he made for them some sort of a substitution of grain room for the intended shipment, and that the libelants lost the profit of a penny and a half per quarter on the recharter which they would have made.

Proof was offered on behalf of the libelants to show that grain-carrying steamships are usually of about 20,000 quarters capacity, and that steamers of about 13,500 quarters capacity, such as the Kestor, are not numerous, and that probably one could not have been obtained after February 1st and before February 15th. The sufficient answer to this, it seems to me, is that no effort was made to obtain such a steamer. It is further urged that, even if the libelants could have procured such a steamer, the E. B. White Grain Company could have refused to load any steamer other than the Kestor. That is true, but it is also true that they have claimed no loss.

So the sole question is whether the libelants, having suffered no loss except the expected profit of a penny and a half a quarter on the recharter, can recover notwithstanding the fact that when the breach occurred freights had declined about three pence per quarter. The profits which may be recovered must be such as may be reasonably presumed were within the intent and mutual understanding of both parties at the time the contract was entered into. Cincinnati Gas Co. v. Western Siemens Co., 152 U. S. 200–206, 14 Sup. Ct. 523, 38 L. Ed. 411.

This contract on the part of the owners of the steamship was an undertaking to furnish a steamship of a certain capacity to take on board from the charterers a cargo of grain at a certain date. There is nothing to show that the owners contemplated anything more, and it is not to be presumed that the profit which intermediately the charterers might contract to obtain upon a subletting of the cargo space was contemplated. I am of the opinion that the profit on re-chartering cannot be recovered, under the circumstances of this case.

The libelants have also sued to recover a commission of 5 per cent. stipulated on the charter party to be paid to them as a commission

and $50 for attendance fee. These are claims which are held not to be maritime and not of admiralty jurisdiction. Richard v. Hogarth (D. C.) 94 Fed. 684; The Ripon City, 102 Fed. 176, 42 C. C. A. 247; Munson v. Straits of Dover, 102 Fed. 926, 43 C. C. A. 57.