## THE CENTURION.

### BREGARO v. THE CENTURION et al.

### AMERICAN SUGAR REFINING CO. v. SAME.

(District Court, S. D. New York. June 27, 1893.)

SHIPPING — DAMAGE TO CARGO — CHARTERED VESSEL—NEGLIGENT STOWAGE—CARGO STOWED BY CHARTERER—LIABILITY.

A steamship which had sugar stowed in the hold, with hogsheads of molasses in the between decks above it, delivered her cargo damaged, certain of the hogsheads having been broken during the voyage, and the molasses having drained down and damaged the sugar. The cargo was stowed in that manner by the charterer, contrary to the advice of the officers of the ship. On the evidence the court found that the stowage was not reasonably sufficient to meet ordinarily rough weather. After the molasses had flooded the hold, the sluiceway became so choked that the molasses could not be pumped up. The charterer claimed that the ship was liable, because the choking of the sluiceways was due to certain sweepings of soda, etc., left over from the ship's previous voyage, and not sufficiently cleaned out when the ship was delivered to the charterer at New York; and that such sweepings, combining with the molasses, produced a hard cement, which choked up the passages. The vessel, when tendered to the charterer, was in generally fair condition, and was inspected by charterer, and thereupon accepted without objection. The bill of lading was signed by the agent of the charterer, and the charter contained the provision that "no claim is to be made against owners for loss of cargo." *Held*, that the charterer was primarily liable for the bad stowage, and the fact that, after inspection, no objection had been made as to the condition of the ship on accepting her under the charter, prevented charterer from holding the ship liable for the choking of her sluiceways and inability to use her pumps. But, *held*, that the ship is generally liable for bad stowage, whether done by owner or charterer. Hence, the fact that charterer's agent signed the bills of lading was immaterial, and, the clause in the charter exempting the ship from liability for loss of cargo not covering a loss by negligence, *held*, that the cargo owner was entitled to a decree for his damage against both ship and charterer, the damage to be collected in the first instance from the charterer, who was bound to indemnify the ship, and any deficit to be paid by the ship.

In Admiralty. Libels by Jose Bregaro and by the American Sugar Refining Company against the Steamship Centurion and the New York & Porto Rico Steamship Company to recover for damage to cargo. Decrees for libelants.

McFarland & Parkin, for libelants.

Convers & Kirlin, for claimants.

George A. Black, for charterers.

BROWN, District Judge. The first of the above libels was filed to recover for the loss, through alleged bad stowage, of a portion of 250 casks of molasses, stowed in the between decks of the steamship Centurion on her voyage from Ponce, Porto Rico, to New York in February, 1893.

The second libel was to recover for damages caused to some sugar stowed in the hold beneath the molasses, and damaged by the leaking of molasses through the between decks above. The shipowners denied negligence, and alleged rough weather and peril of the seas

as the cause of the loss. After the arrest of the Centurion, the New York & Porto Rico Steamship Company was brought in as defendant in the second libel upon the petition of the owners of the Centurion, upon the analogy of the fifty-ninth rule, showing that the steamship was at the time under a charter to the last-named company, under whose servants and agents exclusively her cargo was stowed, and alleging that there was no fault or negligence in the owners, but, if any, in the charterers only, and that the latter were personally bound to pay any damages arising therefrom and to indemnify the shipowners against it. Various exceptions in the bill of lading were also set up. The charterers in answer to the petition alleged that the damage arose through the defective condition of the ship's decks, bilges, scuppers, sluiceways, and bulkhead, and a neglect of the pumps. The evidence shows that the vessel was let to the charterers for a term of six months, at the rate of £740 per month; that the owners should provide and pay for provisions and wages of the captain, officers and crew, for insurance of the vessel, and some other charges; for coal, etc.; and that the captain was to be "under the orders and direction of the charterers," who were "to indemnify the owners from all consequences or liabilities that may arise from the captain in signing bills of lading;" that the charterers should "not be responsible for losses incurred by reason of default, etc., of the pilot, master or crew in the navigation of the ship, including damages by collision; but no claim to be made against owners for loss of cargo;" "all derelicts, salvage and towage to be for owners' and charterers' equal benefit;" "if the charterers should be dissatisfied with the conduct of the captain, officers or engineers, the owners on receiving the particulars of the complaint were to investigate and if necessary make a change in the appointment."

The bills of lading were not signed by the master, but by the agent of the charterers. The stowage of the cargo was attended to by a supercargo appointed by the charterers, in accordance with the terms of the charter; and the supercargo insisted upon stowing the molasses in the between decks, contrary to the advice of the officers. Soon after starting, in moderate weather, some of the hogsheads were found to be rolling, and some additional checks were applied. On the third day out, in a moderate gale, but in a cross sea, the ship took a heavy lurch to starboard, by which the hogsheads in No. 2 'tween decks hold were so shifted and lodged in the starboard wing, that the vessel did not right, but kept a list of about three feet to starboard through the rest of the voyage. On arrival at New York after a voyage of nearly eight days, 88 casks of molasses out of the 250 were found broken and empty; and in others there was a partial loss from being adrift and more or less turned over, causing leakage through the open vent holes. The molasses ran down the pipes into the No. 2 hold beneath, along the sides of the ship, so as not to injure the upper tiers of sugar; but the lower tiers were damaged and partly dissolved through the swashing of the molasses from side to side at the bottom, where it accumulated to a depth of from one to two feet.

It is clear that the loss of the molasses in the No. 2 'tween decks, as well as the damage to the sugar in the hold beneath, arose primarily from the extraordinary drainage; and that this was caused by the shifting of the molasses casks in No. 2 'tween decks, upon the lurch of the ship, by which many of the casks then and subsequently were broken to pieces. A secondary cause of the loss of the sugar was, that the sluiceways in the hold beneath became choked.

The question whether the shifting of the cargo is fairly to be ascribed to sea perils, or to the defective stowage of the molasses, has been most assiduously treated by counsel. Upon a careful study of the testimony I am constrained to find that it arose from the place and mode of stowage, and that the stowage was not reasonably sufficient to meet ordinary rough weather such as was to be reasonably anticipated and provided for. The respondents' witness Butler, a stevedore, testified: "We are supposed to have everything well stowed and secure against ordinary rough weather —no hurricanes though." On the occasion when the molasses shifted, the weather did not approach a hurricane. It was rough; but no more than a gale, such as is often encountered, with cross seas. The weather was not extraordinary; and before any rough weather was encountered, the movement of the casks in No. 2 'tween decks was observed, which the supercargo sought to check.

It is suggested that the shifting of the cargo may not have been caused by any lack of proper dunnage or coigns, but from the width of No. 2 hold, which was without supports where the hogsheads lay in tiers of 10 casks; and that as the ship rolled, the weight of the 9 hogsheads upon the one next to the wing was enough to break those hogsheads from the mere weight of the tiers. This hypothesis is to some extent sustained by the fact that in No. 3 'tween decks, where there was support from stanchions, there was no shifting or breakage. I do not see, however, that this hypothesis, even if correct, relieves the respondents. For it was their duty to stow properly and securely in the place selected for stowing the molasses; and if supporting stanchions to divide the weight of the casks were needed for security in ordinary rough weather, then they were bound to provide proper stanchions. The officers objected to stowing the molasses in the 'tween decks of this ship, where the width was greater than in the hold, the support less, and any rolling more heavily felt. Though molasses, as appears from the evidence, is sometimes carried in the 'tween decks, it does not appear what additional precautions in such cases are taken to prevent shifting or breakage. If the supercargo had a right to stow in the 'tween decks where the liability to shifting and breakage was greater, he was bound to provide the additional precautions to make that place secure against ordinary rough weather. The fact, however, that some rolling of the hogsheads was perceived and complained of soon after the voyage began, and before any rough weather was experienced, shows that the stowage was defective from the first, and discredits the hypothesis that the mere weight of the casks, in the rolling of the ship, was the cause of the derangement and shifting of cargo. The Bur-

gundia, 29 Fed. Rep. 607; The Barracouta, 40 Fed. Rep. 498; The Timor, 46 Fed. Rep. 859; The Glamorganshire, 50 Fed. Rep. 840; The Mascotte, 51 Fed. Rep. 605, 2 C. C. A. 399; The Maggie M., 30 Fed. Rep. 692; The Edwin I. Morrison, 27 Fed. Rep. 136, 141.

For the bad stowage, which was the cause of the loss, the charterers, and not the ship, as between themselves, are primarily responsible. The supercargo was the special representative of the charterers, and the cargo was stowed by his orders, and under his direction. The loss of sugar was the immediate result of the great accumulation of molasses which ran into the hold below. If this result might have been avoided by ordinary skill and diligence on the part of the ship's officers and crew, by keeping the bottom clear of molasses by pumping, no doubt the ship would have been primarily chargeable for so much of the loss as arose through lack of pumping. The Sloga, 10 Ben. 315, 320. But the evidence leaves no doubt that the sluiceways became so choked that nothing could be drawn up by the pumps after the inundation of the hold.

The charterers claim that the sluiceways and limbers became choked because certain sweepings of soda and bleaching powder were left in the ship from the previous voyage, and not cleaned out as they should have been, when she was delivered to the charterers in New York; that those sweepings, combining with the molasses, produced quickly a hard cement, which choked up the passages; and that the owners had agreed to deliver the ship to the charterers in good condition and properly cleaned. The evidence shows that the vessel had been cleaned out and was in a generally fair condition before delivery to the charterers; but that some portions of the soda ash, etc., were not removed. The vessel when tendered was, however, inspected by the charterers, and thereupon accepted without objection. The formation of a cement, in combination with leaking molasses, in a second loading afterwards, is so remote and indirect a consequence as not to involve the ship in responsibility for a loss arising from such a cement, if that was the cause of choking. If the ship was not properly cleaned when tendered in New York, it was for the charterers to object at that time; or to complete the cleaning themselves, and charge the expense to the ship. The latter would be the legal measure of damage from that neglect, if any. Stewart v. Railroad Co., 4 Biss. 362, 363.

I do not find upon the testimony any evidence of negligence in the management of the ship for which her owners are responsible, that contributed to this loss. The charterers by the terms of the charter became the owners pro hac vice as respects all matters pertaining to the handling and delivery of cargo; but not as regards the navigation of the ship, for which, under the express terms of the charter, the owners remained the responsible principals. As this loss arose from the improper stowage of the molasses and the extraordinary drainage consequent thereon, and not from any fault in the management of the ship, the charterers are

primarily answerable for the loss both of the molasses and of the sugar.

The bill of lading in this case was not signed by the master, but by the agents of the charterers. It is on that ground contended in behalf of the ship, that she is not chargeable, even secondarily, for this loss; that the shipper and the libelants were put upon inquiry, and were, therefore, chargeable with notice of the charter and of its special provision, that "no claim was to be made against owners for loss of cargo;" and the analogy of various decisions as regards supplies of coal to chartered vessels is cited in support of this view.

I cannot sustain this contention. In the first place, the provision that "no claim is to be made against owners for loss of cargo," is shown by its context to be nothing more than a stipulation between the owners and the charterers, adjusting their liabilities upon the voyage as between themselves; it has no relation to claims of the shippers of cargo against the ship for any negligent performance of the duties which the law imposes on the ship as a common carrier. The analogy to cases of supplies, moreover, wholly fails in this important particular: that here the ship was let to the charterers for the very purpose of carrying cargo, and for aught that appears, with the usual mutual lien, which the law gives as between ship and cargo. The charter makes the charterers the owners pro hac vice as respects the transportation of cargo, and by necessary implication authorizes freights upon those usual terms. The charter even expressly provides that the owners shall have "a lien upon all subfreights." In the cases of supplies of coal by charterers, on the other hand, there is no such authority from the owners, express or implied, to purchase coal on the ship's account, but the contrary. The charter contains nothing that even by implication excludes the ordinary security of a lien in favor of the cargo against the ship for the performance of the ship's duties in the business for which she was chartered. The ship is, therefore, liable for bad stowage; because the duty to stow properly is one of the duties of carriage which the owner has expressly authorized. The Freeman v. Buckingham, 18 How. 182; Niagara v. Cordes, 21 How. 7. The ship is liable for damage from bad stowage whether the stowage is done by the owners' agent or the charterers'; and equally so whether there is any bill of lading or not. It was therefore immaterial whether the bill of lading was signed by the master, or by the charterers. The Euripides, 52 Fed. Rep. 161, 163, and cases there cited; The Keystone, 31 Fed. Rep. 412, 416, affirmed on appeal.

The result is that the libelants are entitled to a decree against both the ship and the charterers for the damages sustained; but, as the shipowners are entitled to be indemnified by the charterers, the decree will provide that the damage be collected in the first instance from the charterers, and that any amount not collectible from them shall be paid by the ship; and that the shipowners recover against the charterers such sum as they may be called upon to pay, with costs.