## THE SPROTT.

### WYMAN v. THE SPROTT.

(District Court, S. D. New York. September 9, 1895.)

BILL OF LADING SIGNED BY CHARTERER—CAPTAIN'S ASSENT—VESSEL HELD FOR GOODS ON DECK.

Goods being delivered to the charterers of the steamship S. at Antwerp, they signed clean bills of lading for the same "pour le capitaine," with the knowledge and assent of the master. The vessel being subsequently filled below deck, 10 bales of a consignment of wool remained, which were stowed on deck, for which a clean bill of lading had been previously given as above stated. On the day of sailing the master gave a single bill of lading to the charterers for all the goods of the different shippers, naming the different shippers, and stating that the 10 bales were on deck. The 10 bales being injured by sea water, suit was brought by the shipper for damages: *Held*, that though the charterers merely as such had no authority to bind the ship by signing bills of lading, they could do so under the master's assent and authority, which was in this case to be inferred from the circumstances; and that the ship was liable upon the clean bill of lading delivered to the shipper.

This was a libel by Franklin Wyman against the steamship Sprott to recover damages to part of a consignment of wool in bales.

George A. Black, for libelant.
Wing, Putnam & Burlingham, for respondent.

BROWN, District Judge. The libel was filed to recover damages to 33 bales of wool, part of a consignment of 163 bales shipped at Antwerp by J. B. Moores & Co. April 18, 1895, on the steamship Sprott, bound for Boston and damaged by sea water on the voyage. The libelant was the purchaser of the goods and indorsee of

the bill of lading, which was in the usual form and excepted perils of the seas.

Ten of the damaged bales were stowed on deck, on top of the after hatch. During bad weather some heavy seas were shipped, the bales were wet, the lashings became loosened, and through shifting of the bales back and forth, the tarpaulins beneath, which protected the hatches, were torn so that water got in below and injured other bales beneath the hatch before the tarpaulins could be replaced. The question is, whether the ship is liable under the peculiar bills of lading given for this consignment.

The ship was chartered for a single voyage to the Société Colombe Belge de Navigation. On April 20th, just before she sailed, the master signed a general bill of lading, with a copy of the ship's manifest attached, containing a statement of all the goods on board, with the names of numerous different shippers, the marks, and the consignees. The 163 bales in question were therein specified as shipped by Fuhrman and consigned to Moores & Co., and 4 of them (mistake for 10) as "shipped on deck at shipper's risk." This bill of lading referred to the list attached, and repeated the statement that the goods shipped on deck were at shipper's risk. The 10 bales were stowed on deck because there was no room for them below, and the charterers insisted, against the master's objection, that they should go along with the rest of the consignment. That was the only bill of lading signed by the master. It was delivered by him to the charterers, and it recited the charterers as shipping all the goods on board, although the list attached stated various other persons as the shippers. He gave no bill of lading to any of the several shippers stated in that list.

Prior to this general bill of lading signed by the master, the charterers had executed bills of lading to the several shippers, apparently as the goods were delivered for transportation, and before they were laden on board, and among them the bill of lading indorsed to the libelant. They were all signed "pour le capitaine," i. e., for the captain. The libelant's bill of lading was dated April 18th, two days before the general bill of lading signed by the master. Most of this shipment went below deck, but the ship was full before all was loaded, and the remaining bales were placed on deck. The libelant's bill of lading made no reference to any goods on deck, and did not contain the exception above referred to, for the reason, evidently, that when it was signed by the charterers, "for the captain," it was expected that all could be stowed below deck.

Upon the master's bill of lading manifestly the ship is not liable for the 10 bales, since they were stated in that bill of lading to be "at shipper's risk." Under the other bill of lading, signed by the charterers "pour le capitaine," the ship is liable, provided the charterers were authorized to execute it; for in that case it would be equivalent to a bill of lading signed by the master himself, upon which there is no doubt that the ship would have been liable.

The charter provided that the master and crew should be appointed and paid by the shipowners, and the ship maintained by the

latter in good condition; that the "captain should be under the orders and direction of the charterers as regards employment, agency, and other arrangements"; that he should "sign bills of lading as presented"; and that the charterers should indemnify the owners therefrom; that the whole stowage capacity of the ship should be at charterers' disposal; and that she would carry "a reasonable deck load at charterers' risk."

For the libelant it is claimed that the clause providing that the master should "sign bills of lading as presented" with indemnity from the charterers, was equivalent to an authority from the ship-owners to the charterers to sign bills of lading themselves, or to require the master to sign them in any form the charterers pleased, even to giving clean bills of lading, as in this case, for goods carried on deck; that the ship would be bound thereby; and that for any damages that arose from the misuse of this authority, the ship-owners must look to the charterers for indemnity under the clause of the charter that provided for such indemnity.

I cannot concur in this view. It is not a reasonable construction to suppose that the charter was intended to authorize the giving of bills of lading in violation of its own express provisions. It authorized the carriage of goods on deck, but provided that this should be done at the charterers' risk. It did not authorize a clean bill of lading to be given by anybody for a deck cargo. The charter did not authorize the charterers to sign any bills of lading at all. It provided that they should be signed by the master, and "as presented." This means as lawfully and rightfully presented, under the charter provisions. The Tongoy, 55 Fed. 329; Jones v. Hough, 5 Exch. Div. 116, 120; Baumwoll, etc., v. Furness [1893] App. Cas. 15.

Nor had the charterers, merely as such, any authority by implication to issue bills of lading. The charter was of a mixed character. In some respects the charterers were in the position of owners pro hac vice, and could bind the ship. The Centurion, 57 Fed. 416. But no authority can be derived from the charter by implication that is inconsistent with its own provisions. As the charter provision for the appointment of the master by the owner was in part for the general protection of the interests of the shipowner against the misuse of the ship, or irregularity, or fraud, so the provision that bills of lading should be signed by the master was evidently designed as a safeguard pro tanto against any improper charges against the ship through the issue of bills of lading improperly by the charterers, or other persons. That clause, therefore, excludes any authority in the charterers, from the mere charter itself, to bind the ship by bills of lading; and if there were no other circumstances importing any such authority, I should hold the ship not bound.

The bill of lading delivered to the shipper, however, does not purport to be executed by the charterers on their own account, or by virtue of any power of their own as charterers to bind the ship by their own bills of lading. They signed it "pour le capitaine," i. e., as agents of the captain. In issuing this bill of lading the charterers represented themselves to be the captain's agents for that pur-

pose. The bill of lading purports to be the captain's bill of lading, executed by the charterers as his agent. The charter itself did not authorize the charterers to act as such agents, neither did it forbid this, if the captain chose to authorize them to sign the bills of lading in his behalf.

The circumstances proved seem to me to be inconsistent with any other reasonable hypothesis than that the master did authorize the charterers to sign bills of lading for such goods as were delivered to the ship for transportation. The evidence on this point is very meager; but it is the more persuasive so far as it goes, from the fact that it is all derived from the master's own deposition. He was not asked whether he had authorized or requested the charterers to sign bills of lading in his behalf, but he does not say that he had not done so. He knew that the goods came from many different shippers; and that, as a matter of course, the ship was to give a bill of lading to each shipper. He did not personally sign any of these necessary bills of lading. He testifies that he knew the charterers were signing bills of lading for all these goods, and that he saw them doing so in their office, though he did not read them. He knew that these bills of lading were for the shippers' uses, as commercial documents on which they are entitled to rely, both as the usual evidence of shipment, and as to the rights of the shippers and of their indorsees thereunder. When the ship was full and the 10 bales remained, they were put on deck at the charterers' request because, as he says, "I knew they had signed bills of lading for them before they went into the ship possibly, and that is the reason they wanted them to go with her." There is not the least intimation by the captain that this signing of bills of lading by the charterers was not done with his full concurrence; no objection to it on his part is intimated by him. It was work required to be done by him, or by some one in his behalf, as he knew; and some of it was done in his actual presence; and on his examination, he does not deny that he authorized it. This knowledge and concurrence, in the absence of all negative evidence, under such circumstances, import an authority from the master to the charterers to sign the bills of lading in his behalf. 1 Pars. Shipp. & Adm. 185. It is not necessary to consider whether the master could lawfully delegate this authority so completely as to divest himself of all supervision or control over the signing of bills of lading; for this is not such a case. Here the charterers acted in the immediate presence of the master, and scarcely otherwise than as his amanuenses. And in such a case I cannot doubt that the ship and master are bound to third persons upon bills of lading thus executed in his behalf, with his knowledge and concurrence, the same as if signed by himself in person.

Under these circumstances, therefore, I must find that the duty of the master and the obligation of the ship were the same as if the master had personally signed clean bills of lading for the whole 163 bales, and thereafter found that he must leave behind the last 10 bales or else take them on deck. The duty of the master in that case would have been to let the shipper know the facts, and take his instructions. That was his duty here. For the master knew that

clean bills of lading had been issued in his behalf, and that the shipper was entitled to rely thereon for the usual security of under-deck cargo. Yet he took no steps, he says, to notify the shippers that the 10 bales must go on deck, or remain behind. There is nothing in the testimony concerning notice of this fact given, or designed to be given, by the charterers to the shipper.

I do not think it is any defense to the ship that the bill of lading signed by the master recited the shipment of all the cargo as having been made by the charterers. The ship is not entitled to claim from that circumstance that it was dealing with the charterers alone, and had no privity with the actual shippers. For the master knew to the contrary. His own bill of lading recited the actual shippers, and he knew that the usual bills of lading had been given to those shippers on the ship's account. To suffer the ship, therefore, to deny any privity with the actual known shippers, under cover of a single bill of lading given to the charterers as sole shipper, would be to uphold a mere subterfuge, and a virtual fraud upon the shippers; since the ship's bills of lading were given to shippers with the master's knowledge and concurrence, and on his account. The master, knowing that clean bills of lading had been given for the 163 bales, knew that the charterers had no authority to ship them on deck at shipper's risk. His own bill of lading to the charterers with that exception inserted, is therefore, no protection to him or to the ship; and if he repudiates the bill of lading signed in his behalf by the charterers, as respects goods other than the charterers' goods, he is in the situation of a master who has received goods for transportation without giving any bill of lading for them at all; and upon that theory he would be bound to carry the goods in the customary manner, that is, under deck. The Delaware, 14 Wall. 579.

The goods damaged below were damaged by sea water through heavy gales. That was a sea peril. The evidence does not show any such negligence on the ship's part as to charge her with fault in not avoiding this damage. It was not negligence, nor any breach of duty, to carry deck cargo. The after hatch was considered the safest place on deck. It was a usual place, and I do not find any customary and reasonable precautions against injury omitted.

Decree for libelant for the damage only to the 10 bales carried on deck, with a reference to compute the amount, if not agreed upon, with costs.