## THE ESROM.

### J. K. ARMSBY CO. v. ACTIESELSKABET DAMPSKIBET ISLAND.

(Circuit Court of Appeals, Second Circuit. February 24, 1921.)

No. 134.

1. Shipping ⬥120—Ship liable for damages to cargo, without bill of lading.

A ship may be held liable in rem for damages to the cargo, even though no bill of lading or contract of affreightment was signed by the master; and hence, if negligence or fault was proved, the ship would be responsible, independent of the form of the contract of affreightment, or though the bill of lading was signed by the charterer, and not by the master. (Per Manton, Circuit Judge.)

2. Shipping ⬥133—Reciprocal liens arise when cargo received on board, but not before.

Reciprocal liens between the ship and cargo arise at the time that the cargo is received on board; but the obligation between the ship and the cargo is mutual, and does not attach until the cargo is on board or in the master's custody. (Per Manton, Circuit Judge.)

3. Shipping ⬥123—Ship liable in rem for improper stowage or rough handling before voyage begun.

The obligation of the ship to the cargo, created when the cargo is received on board, is an obligation not to injure the merchandise by improper stowage or rough handling, and if she does there is a liability in rem, even before the voyage is begun. (Per Manton, Circuit Judge.)

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. Shipping ☞106—Ship bound by charterer's bill of lading after voyage is begun.

When the vessel starts on the voyage, there is by implication a ratification and adoption by the ship of the charterer's contract with the shipper, and it is then bound by the charterer's bill of lading. (Per Manton, Circuit Judge.)

5. Shipping ☞125—Shipper dealing with charterer cannot recover for damage due to delay in sailing under terms of the charter.

Where a shipper contracted with a charterer, and not with the ship, with knowledge that the charterer was not the owner of the ship, and the charter bound the ship not to sail until she had a full cargo, the ship was not liable to the shipper for damage to the shipment, due to delay in sailing while waiting for a full cargo. (Per Manton, Circuit Judge.)

6. Shipping ☞125—Delay in sailing does not establish liability, unless vessel has reasonable ground to anticipate damage.

Delay in sailing alone does not necessarily establish a ship's liability for damage due to the delay, and there is no liability unless the vessel had reasonable ground to believe that the delay would damage the cargo. (Per Manton, Circuit Judge.)

7. Shipping ☞125—Shipper of perishable freight takes risk of reasonable delay in sailing.

A ship is not bound to sail any more quickly because a single item of the cargo is perishable, and the shipper takes the risk of the reasonable time for sailing whatever it may be. (Per Hough, Circuit Judge.)

8. Shipping ☞104—Shipper's lack of knowledge of terms of charter of which he knew immaterial.

Where a shipper knew he was dealing with a charterer and putting his goods on a hired vessel, it was immaterial that he neither knew nor inquired concerning the exact terms and conditions of the charter party. (Per Hough, Circuit Judge.)

9. Shipping ☞106—Master, signing bill of lading, contracts for his principals.

A bill of lading is both a receipt and a contract, and if a shipowner's master signs the bill, he receipts and contracts for his own principals. (Per Hough, Circuit Judge.)

10. Shipping ☞106—Charterer's bill of lading not equivalent to master's, though charter required master to sign bills.

A bill of lading signed by a charterer was not equivalent to one signed by the master, as respected the liability of the ship, though the charter party required the master to sign bills of lading, and, under the owner's instructions, he refused to do so. (Per Hough, Circuit Judge.)

11. Shipping ☞133—Union of ship and cargo gives no privilege or lien for delay in sailing.

The mere union of ship and cargo arising from the loading of the cargo on the ship gives no privilege under continental marine law for damages from delay in sailing, and no lien under American maritime jurisprudence for such delay, where the shipper knew he was dealing with the charterer and took the charterer's bill of lading. (Per Hough, Circuit Judge.)

12. Shipping ☞125—Shipper, knowing of charter, could look only to charterers for delay in sailing.

A shipper who knew that the ship was under charter is presumed to know that charterers direct the movements of the ships they hire, and can look only to the charterers for delay in sailing. (Per Hough, Circuit Judge.)

Ward, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel filed by the J. K. Armsby Company against the steamship Esrom, her engines, etc., Actieselskabet Dampskibet Island, claimant. Decree for libelant (261 Fed. 624). Claimant appeals. Reversed.

Burlingham, Montgomery & Beecher, of New York City (Roscoe H. Hupper and Homer H. Breland, both of New York City, of counsel), for appellant.

D. Roger Englar, Harrington Bigham & Englar, and Curtis, Mallet-Prevost & Colt, all of New York City, for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. This libel is filed to recover damages caused to 51 cases of prunes loaded on the steamship Esrom at New York in August, 1915. They were consigned to a consignee in Copenhagen. The Esrom was under charter to the Interocean Transportation Company on July 15, 1915. The voyage charter contained the following provisions:

"A full and complete cargo of wheat and/or maize and/or other lawful merchandise, and being so loaded shall forthwith proceed as ordered upon signing bills of lading to Gothenburg and Copenhagen."

"Charterers shall pay the vessel freight as follows: 57/ (fifty-seven shillings B. S.) per ton of her actual deadweight carrying capacity of cargo. Freight prepaid in New York before steamer leaves New York less 2½ per cent. discount."

"The captain shall sign bills of lading or master's receipts as and when presented, without prejudice or reference to this charter party, and any difference between the amount of freight by the bills of lading and this charter party to be settled at port of loading before sailing, as customary."

When, on August 11, 1915, the shipment of prunes was loaded on board, there was not a full cargo to be loaded. A bill of lading dated August 11, 1915, signed by the Interocean Transportation Company, was given in exchange for the libelant's payment to it of freight amounting to $1,685.04. This payment was made by an agency which booked the cargo for the appellee. The master did not sign the bill of lading, and no freight was paid to the master or the owner. Nor were there any negotiations by or on behalf of either the master or owner concerning the shipment. The ship was under contract not to sail until a full and complete cargo of merchandise was loaded, and the charter further provided that the Interocean Transportation Company was to do the loading, stowage, and trimming of the cargo at its expense. The Interocean Company did not have a full cargo on hand, and continued loading the vessel until September 16th, and even then did not furnish a full cargo. A petition in bankruptcy was filed against it on September 17th, at which time there was on board the prunes in question in the lower No. 4 hold. The Interocean Company has never paid the charter freight.

On September 22d, after the appointment of a receiver in bankruptcy, a meeting of the several shippers was had. On the same day, the appellee, through its attorney, wrote the agent of the owners of the Esrom, stating that the cargo of prunes had probably suffered serious deterioration, owing to the delay in the sailing for Copenhagen, and that additional delay would probably result in the goods becoming

worthless, and demanded that the shipment be discharged and sold for the account of whom it might concern. Thereafter a shippers' committee was formed to arrange for the forwarding of the cargo or redelivery of the perishable cargo. After demand all the cases of prunes were discharged at a dock secured on or about October 1st. An examination was then made, and it was found that some of the prunes were badly damaged; some not so badly. A sale was had of those which were in such condition that they might be sold. The damage was caused by the hot weather which existed in the port during the period that the ship was loading. Apparently they were received by the steamship in good condition.

There is expert testimony as to the cause of the damage, but the view we take of the case does not require our examining the cause of deterioration. The Esrom sailed on October 9th for Copenhagen, and did not arrive at her destination until one year later. She had been intercepted by the British and taken into Hull, and this, pursuant to the practice of British authorities under war conditions, seizing vessels bound for Scandinavian ports. This fact is referred to because the claim of the appellant is that, even though the prunes were on board, it is questionable whether the vessel would have arrived at the port of destination. However, it is a subject we need not discuss in this opinion, since for other reasons we conclude there is no liability on the part of the ship owners.

[1] The ship may be held liable in rem for damages to the cargo, even though no bill of lading or contract of affreightment was signed by the master. A shipowner may be held to the common-law liability. In Brower v. Water Witch, Fed. Cas. No. 1,971, affirmed 66 U. S. (1 Black) 494, 17 L. Ed. 155, it was held that where a shipment of cotton was damaged, even if no bill of lading or other agreement was entered into by the master, the receipt of the merchandise, by the vessel consenting to its being loaded for a port of destination, subjected the ship to liability; that the agents of the charterers in whose services the brig was at the time, and who were interested in procuring cargoes, and who entered into an agreement fixing the terms upon which the shipment was to be made, made the vessel bound by such agreement. The obligation is imposed as a common-law obligation of the carrier. In The Euripides (D. C.) 52 Fed. 161, it was said:

"But the liability of the ship would be the same without any bill of lading. The original charterers undertook to transport these goods; this was done by the authority and consent of the shipowners, for such was the very object of the charter. The ship is therefore answerable for any negligence that causes damage to the goods, and is answerable to the shipper, or to his vendee, upon the implied contract to transfer safely, whether a bill of lading is issued or not."

In the Centurion (D. C.) 57 Fed. 412, Judge Brown said:

"The charter contains nothing that even by implication excludes the ordinary security of a lien in favor of the cargo against the ship for the performance of the ship's duties in the business for which she was chartered. The ship is therefore liable for bad stowage, because the duty to stow properly is one of the duties of carriage which the owner has expressly authorized.

The Freeman v. Buckingham, 18 How. 182; Niagara v. Cordes, 21 How. 7. The ship is liable for damage from bad stowage, whether the stowage is done by the owners' agent or the charterers', and equally so whether there is any bill of lading or not. It was therefore immaterial whether the bill of lading was signed by the master or by the charterers."

In the case of The Sprott (D. C.) 70 Fed. 327, a steamer was held in rem for damages to cargo which was carried on deck although the bills of lading were signed by the charterer. It was there said:

"I do not think it is any defense to the ship that the bill of lading signed by the master recited the shipment of all the cargo as having been made by the charterers. The ship is not entitled to claim from that circumstance that it was dealing with the charterers alone, and had no privity with the actual shippers. For the master knew to the contrary. His own bill of lading recited the actual shippers, and he knew that the usual bills of lading had been given to those shippers on the ship's account. To suffer the ship, therefore, to deny any privity with the actual known shippers, under cover of a single bill of lading given to the charterers as sole shipper, would be to uphold a mere subterfuge, and a virtual fraud upon the shippers; since the ship's bills of lading were given to shippers with the master's knowledge and concurrence, and on his account. The master, knowing that clean bills of lading had been given for the 163 bales, knew that the charterers had no authority to ship them on deck at shipper's risk. His own bill of lading to the charterers, with that exception inserted, is therefore, no protection to him or to the ship; and if he repudiates the bill of lading signed in his behalf by the charterers, as respects goods other than the charterers' goods, he is in the situation of a master who has received goods for transportation without giving any bill of lading for them at all; and upon that theory he would be bound to carry the goods in the customary manner; that is, under deck. The Delaware, 14 Wall. 579."

If negligence were proved, or fault shown, the Esrom would be responsible to the libelant independent of the form of contract of affreightment, or even though the bill of lading was not signed by the master.

[2] There were reciprocal liens between the Esrom and the cargo of prunes, which arose at the time the cargo was received on board and obligations were then imposed. In Vandewater v. Mills, 60 U. S. (19 How.) 82, 15 L. Ed. 554, it was said:

"But this duty of the vessel, to the performance of which the law binds her by hypothecation, is to deliver the cargo at the time and place stipulated in the bill of lading or charter party, without injury or deterioration. If the cargo be not placed on board, it is not bound to the vessel, and the vessel cannot be in default for the nondelivery, in good order, of goods never received on board."

But the obligation between the ship and cargo is mutual and reciprocal, and does not attach until the cargo is on board or in the custody of the master. The Lady Franklin, 75 U. S. (8 Wall.) 325, 19 L. Ed. 455; Scott v. Ira Chaffee (D. C.) 2 Fed. 401. This rule is not inconsistent with the authorities cited, which hold that the vessel's lien upon the cargo is subject to be defeated if, before the vessel breaks ground, she becomes unseaworthy or disabled and unable to finish her voyage. Tornado, 108 U. S. 342, 2 Sup. Ct. 746, 27 L. Ed. 747; Eugene Viesta (D. C.) 28 Fed. 762. But the lien of the vessel upon the goods and of the goods upon the vessel attaches from the moment the

goods are laden on board, and not from the time only when the ship breaks ground. Bird of Paradise, 72 U. S. (5 Wall.) 545, 18 L. Ed. 662; Bulkley v. Naumkeag Co., 65 U. S. (24 How.) 386, 16 L. Ed. 599.

This court said in National Steam Nav. Co., Ltd., v. International Paper Co., 241 Fed. 862, 154 C. C. A. 565:

"The obligation of the ship to carry, and of the shipper to pay for the carriage, accrues when the goods are delivered to the ship."

[3, 4] The obligations which are created one to the other, then, are that the ship is bound not to injure the merchandise by improper stowage or rough handling, and, if she does, then there will be a liability in rem, even before the voyage is begun. If the voyage is begun, the vessel must carry the goods to destination on the terms agreed by the shipper with the charterer; for when the vessel starts upon the voyage, by implication, there is a ratification and adoption by the ship of the charterer's contract with the shipper. Then the shipper is deprived of an opportunity to retake his goods, and the goods are in the sole possession and control of the ship. So, too, the ship is then bound by the charterer's bill of lading, under which the freight is prepaid, and cannot collect further freight at destination. The Ada (D. C.) 233 Fed. 325. Before sailing, the vessel owner is protected by his opportunity to refuse to carry the goods on the terms agreed by the charterer before the voyage is commenced.

[5, 6] But in the case at bar the libelant made its contract for freight with the Interocean Transportation Company, and not with the ship, and the libelant must be charged with knowledge that the Esrom was a chartered vessel, owned in Denmark, and not by the Interocean Company. Such knowledge on the part of the shipper is clear. It is pleaded in the libel. If the shipper intended to hold the shipowner in place of the charterer to the terms of the bill of lading, it should have required the bill of lading to be signed by the master. The Delaware, 81 U. S. (14 Wall.) 579, 20 L. Ed. 779. The charter was a contract by the terms of which the ship was bound. She could not sail until she had a full cargo. She would therefore have breached the contract if she had sailed any time before full cargo was obtained. On September 22d, after the receiver was appointed, was the first time that the shipowner was requested to do anything concerning the prunes to prevent deterioration or decay. Up to this time the charter was supreme in imposing duty and responsibility on the ship owner. The obligations of the ship to the cargo were determined by its terms. There is no claim of fault in handling the boxes of prunes or in their stowage.

Reliance must therefore be placed wholly upon the delay in sailing which resulted in the damage. Delay alone does not necessarily establish liability for damage. The Bohemia (D. C.) 38 Fed. 756. Unless the vessel has reasonable ground to believe that the delay will damage the cargo, liability will not be imposed. N. Y. & P. R. S. Co. v. Guanica Centrale, 231 Fed. 820, 145 C. C. A. 640. During the time which elapsed between the failure of the Interocean Company and the date when the prunes were unloaded pursuant to the directions of the at-

torneys for the receiver of the Interocean Company, the vessel did all that could be expected of it under the circumstances. Before that time, it was not permissible for the vessel to violate its contract with the Interocean Company, even upon the shipper's demand. Therefore it was not incumbent upon the ship or her owner to violate the contract with the Interocean Company and sail, for to sail would have breached the requirement to wait until a full cargo was secured.

We think that no liability can be imposed upon the vessel, and that it was error below to sustain the libel.

Decree reversed.

HOUGH, Circuit Judge (concurring). Though substantially agreeing with the opinion written for the court by Judge MANTON, the novelty of this litigation may excuse a personal statement.

1. The differences between this case and The Esrom (C. C. A.) 262 Fed. 953, are that the earlier libelant had a bill of lading signed by the master; this libelant has not, and the tobacco of that case seems to have been somewhat less perishable than the prunes of the present litigation.

[7] 2. I should be content to rest decision upon the narrow ground that the apostles contain no evidence whatever as to what would have been a reasonable time for the sailing of the ship. It seems to be thought that the ship was bound to sail before the prunes spoiled; that is to say, the more perishable a single item of cargo, the more quickly should the ship depart. This is not law; the shipper takes the risk of the reasonable time, whatever it may be.

But, considering the broader questions properly raised and argued—

[8] 3. It is to be emphasized that this shipper well knew that he was dealing with a charterer, and putting his goods on a hired vessel. Knowing this much, that he neither knew nor inquired concerning the exact terms and conditions of the charter party is immaterial.

[9] 4. This shipper had no personal contract whatever with the ship owners. A bill of lading is both a receipt and a contract, and if the owner's master signs the bill, he has receipted and contracted for his own principals. This was the ground of decision in the case just cited.

[10] 5. That the charter party required the master to sign bills of lading, and that he under owner's instructions refused so to do, does not benefit the shipper in any way. It furnished the charterer with a cause of action, though such cause would probably have been injuria sine damno under the circumstances here shown; but by no principle of law can refusal become the equivalent of compliance, and so make the charterer's bill of lading identical in effect with the master's bill, which is substantially the libelant's position. No trick was played on the shipper, as in The Sprott (D. C.) 70 Fed. 327.

[11] 6. There did exist between shipper and the personified ship mutual obligations dependent wholly upon that union of ship and goods arising from the lading of the former on the latter, lately discussed at some length in The Saturnus, 250 Fed. 407, 162 C. C. A. 477, 3 A. L. R. 1187.

7. But that union did not per se give rise to any "privilege" under continental marine law, even for damages through delay occasioned by the fault of the owner. The Ripon City, 102 Fed. 182, 42 C. C. A. 247.

8. There is no authority for asserting that by our own peculiar maritime jurisprudence a lien for mere delay arises from the union of the ship and goods, in favor of a shipper who knew that he was dealing with a charterer, and took the charterer's bill of lading.

[12] 9. In the absence of that contract with the owners usually evidenced by a master's bill, this libelant was entitled to look to the personified ship for proper stowage, seamanlike management, and right delivery; but he can look to charterers only for the date of sailing. As he knew of the chartered relation, he is presumed to know that charterers direct the movements of the ships they hire; all ships are chartered for that purpose.

WARD, Circuit Judge (dissenting). The owners of this steamer chartered her for one voyage to the Interocean Transportation Company, to be put on the berth as a general ship. The charter party was not a demise. Article 13 of the charter party provided that "the captain shall sign bills of lading or master's receipts as and when presented, without prejudice or reference to this charter party," a provision which did not preclude the owners from authorizing some other agent to sign, either expressly or impliedly.

The prunes were loaded aboard August 8, and the bill of lading signed by the Transportation Company August 11, making no reference whatever to the charter party, concluded with an attestation clause of a very usual form as follows:

"In witness whereof, the master or agent of the steamship hath affirmed to three bills of lading, all of this tenor and date, one of which being accomplished the others to stand void."

The freight was paid in advance. The proof is that the owner's agent, resident in this port, after the master had signed some bills of lading, ordered him to sign no more; that he knew the charterers were signing them, and that he gave these orders to the master, because he thought it might put the owners in a better position.

"Q. Well, as matter of fact, to get right down to the facts of this case, your understanding was, and the basis on which you acted was, that if the master signed these bills of lading, you felt that you would be exposing the ship to liability, but that if the charterer signed them you would not? A. Well, I felt that the consideration might be a little different; I don't know just what."

As the master had signed some of these bills of lading, knowledge of their contents is imputable to the owners. How can it be said that the owners, knowing that cargo belonging to various shippers was going aboard their steamer under bills of lading signed by the charterers, as agents for the steamship, did not make the charterers their agents for that purpose? The bill of lading, if signed by the master, would have bound the ship, and if the charterers signed it as the agent of the owners of the ship, with their consent, express or implied, it has exactly the same effect. Whether the master or the charterers signed the

bill of lading was a mere technicality as Lord Chancellor Loreburn said in Owners of Steamer Knutsford v. E. Tillmans & Co., [1908] A. C. 406:

"The other point—namely, that one of the bills of lading was signed by Messrs. Watts, instead of by the captain—to my mind is destitute of validity in law, and even more destitute in merits. If the captain had been directed to sign it, he was obliged to sign it. The point is a merely technical point, that the proper signature was not there. As a matter of fact, I should be very sorry to lay down any rule that under such a contract the charterer or shipowner could always sign; but I am not satisfied that the captain did not know perfectly well of this signature and sanction it. I think that there is absolutely nothing in that point also."

Consent of the owners must in my opinion be implied from their conduct. Otherwise they might say, without giving any notice to the shippers, who were paying freight in advance to the charterers:

"We will carry the goods laden aboard our steamer to destination liable as insurers, but with the right to collect a reasonable rate of treight, to be there ascertained and collected."

This would certainly be a surprise to the shippers, and in my judgment a fraud. They did in this case demand of the shippers an additional freight of 50 per cent. The language of Judge Addison Brown in Re Sprott (D. C.) 70 Fed. 327, 331, is appropriate in this connection:

"I do not think it is any defense to the ship that the bill of lading signed by the master recited the shipment of all the cargo as having been made by the charterers. The ship is not entitled to claim from that circumstance that it was dealing with the charterers alone and had no privity with the actual shippers; for the master knew to the contrary. His own bill of lading recited the actual shippers, and he knew that the usual bills of lading had been given to those shippers on the ship's account. To suffer the ship, therefore, to deny any privity with the actual known shippers, under cover of a single bill of lading given to the charterers as sole shipper, would be to uphold a mere subterfuge and a virtual fraud upon the shippers; since the ship's bills of lading were given to shippers with the master's knowledge and concurrence, and on his account. The master, knowing that clean bills of lading had been given for the 163 bales, knew that the charterers had no authority to ship them on deck at shipper's risk. His own bill of lading to the charterers, with that exception inserted, is therefore, no protection to him or to the ship; and if he repudiates the bill of lading signed in his behalf by the charterers, as respects goods other than the charterers' goods, he is in the situation of a master who has received goods for transportation without giving any bill of lading for them at all, and upon that theory he would be bound to carry the goods in the customary manner; that is, under deck. The Delaware, 14 Wall. 579."

In this view of the case the charter party is a perfectly irrelevant document as between the ship and the shippers. Judge Garvin found that the prunes shipped August 8, 1915, were damaged by decay caused by heat while the steamer was lying at the pier ([D. C.] 261 Fed. 626), and he entered a final decree in favor of the libelants, from which this appeal is taken.

In a former suit arising out of the same voyage (The Esrom [C. C. A.] 262 Fed. 953), in which the master did sign the bill of lading, we held that it constituted the whole contract between the shipper and the ship and owners, but that no proof of damage had been made. The

shipment was of tobacco, which was not itself injured by the delay. We held that the libelant had not shown that the delay in sailing was unreasonable.

The ship owes the duty of transporting every shipment in view of its character. If she accept perishable shipments, she must exercise the care and protection for them which their character requires. She cannot load and stow them, and delay sailing as if they were shipments of pig iron. Having accepted a shipment of prunes, she was bound to sail within a reasonable time for prunes. The Gordon Campbell (D. C.) 141 Fed. 435.

It is true that in respect to delivery at destination the interests of all the shipments must be considered as a whole. The Bohemia (D. C.) 38 Fed. 756; N. Y. & P. R. S. S. Co. v. Guanica Centrale, 231 Fed. 820, 145 C. C. A. 640. But acceptance of cargo is different. The ship should have notified the shipper of perishable cargo that she would not sail until fully loaded, and of the delay, which was becoming perfectly obvious, and have given the shipper the privilege of taking its shipment back, as it eventually did when it learned the facts.

The District Judge having found as a fact that the prunes in this case were damaged as a result of the delay in sailing, I think the decree should be affirmed.