## AKTIESELSKABET BRUUSGAARD v. STANDARD OIL CO. OF NEW JERSEY.

(District Court, S. D. New York. July 14, 1921.)

No. 811.

1. **Shipping ⌾╌149—Charter party held not to expressly authorize charterer to collect freight.**

   Provision of charter party that freights shall be all prepaid without discount on signing bills of lading *held* not to mean that the charterer must collect the freight in advance, and so to authorize him to collect it, and therefore to sign bills of lading, but to be intended to protect the ship's hire against the charterer.

2. **Shipping ⌾╌153—Shipper, defending against owner's claim for freight, held to have burden of showing the master authorized the charterer to sign bill of lading.**

   The charter party containing a provision intended to protect the ship's hire against the charterer, a shipper, defending against claim of the ship owner for freight, notwithstanding it had been paid to the charterer, has the burden of showing that the master authorized the charterer to sign bill of lading and collect the freight as he did.

3. **Shipping ⌾╌149—Master, by receiving goods on board, does not ratify charterer's unknown bill of lading.**

   The master, by receiving goods over the rail, does not ratify any unknown bill of lading signed by him per the charterer and given to the shipper, and on which the freight was paid to the charterer.

4. **Customs and usages ⌾╌3—Custom, whereby charterer has authority to sign bills of lading, must be shown independently of express authority.**

   The only proof of custom, whereby the charterer has authority to sign bills of lading and collect freight, that would count, is that without express authority charterers commonly undertook to so sign and collect.

5. **Shipping ⌾╌106, 149—The charterer, as such, not agent to sign bills of lading or collect freight.**

   The charterer, as such, is not an agent to sign bills of lading or collect freight.

In Admiralty. Libel by the Aktieselskabet Bruusgaard against the Standard Oil Company of New Jersey. Decree for libelant.

Libel in personam for freight upon a cargo of oil carried from New York to South America under the following circumstances:

The libelant, through its New York agents, on April 24, 1919, chartered the Norwegian ship Maella to the C. H. Pattengill Corporation, a New York corporation, on a rate charter from any United States Atlantic port to Montevideo or Buenos Ayres, at $19.50 per ton if to Montevideo, and $18.50 if to Buenos Ayres, "all prepaid without discount on signing bills of lading and considered earned and irrevocable, vessel lost or not lost." The Pattengill Corporation was acting as agent for the Caravel Steamship Company, and the libelant, although they did not know this fact, did know that the Caravel Steamship Company was to act as loading agent. Before signing the charter, the Caravel Steamship Company had attempted to get the Maella and two other ships, but had been refused; the libelant's agents being not satisfied with their responsibility.

The respondent had a shipment of some 3,000 barrels of oil which it wished to send to South America, and, after negotiations with the Caravel Steamship Company's broker, made an agreement with it to load the same on the Maella. Schoultz, the president of the steamship company, signed two bills of lading, which he delivered to the respondent, and which concluded as follows: "In

⌾╌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

witness whereof the master or agent of said vessel hath signed two bills of lading," etc., "by Arthur W. Schoultz." Schoultz collected the whole freight, some $16,489, and eventually paid the same to the Pattengill Company, who applied it on the account of another vessel. Thereafter the owner's agent learned that the Caravel Steamship Company was signing bills of lading and sent word to all the shippers that they would not be bound thereby.

Before the ship sailed, the master refused to carry the oil, unless upon payment of the freight in accordance with the charter party, and thereupon the parties entered into a stipulation by which, it was agreed that the cargo should remain in the ship and should be carried to destination, and that, if the position of the ship were right, the reasonable freight was $16,489, which the libelant should recover, but that, if the payment of freight had bound the ship, there should be no recovery.

John W. Griffin, of New York City, for libelant.
Charles R. Hickox, of New York City, for respondent.

LEARNED HAND, District Judge (after stating the facts as above). It appears to me that this case does not turn upon the question which was most debated at bar. It has been treated as though the question were whether the ship were bound to carry the oil, once it had been received over the side. That is by no means an essential consideration. I may assume, without deciding, that "the ship is bound to the cargo" as soon as she lifts it. Still the critical question would remain whether the freight had been prepaid. Unless payment to the Caravel Steamship Company was payment to the ship, the freight was not paid, and "the cargo was bound to the ship" as much as "the ship to the cargo." Now, the last question—i. e., whether payment to the Caravel Steamship Company was payment to the owners—is not a question of maritime law at all, in the sense that it depends upon any "privilege" of the cargo against the ship. It turns wholly upon a question of fact, which is whether the owners had constituted the charterers, and the charterers might in turn constitute their loading agents, agents to collect freight.

[1] First. It is necessary to decide whether there was an express authority given the charterer, and there was no express agreement, except the charter party itself. This mentions bills of lading only three times: First (line 15), that the port of discharge shall be "as ordered on signing bills of lading"; second (lines 31, 32), that freights (hire) shall be "all prepaid without discount on signing bills of lading"; third (line 97), that "cargo" is "to be consigned on bills of lading to named receivers." The shipper argues that the second of these means that the charterer must collect the freight (hire) in advance and might therefore sign bills of lading. This construction seems to me extremely unreasonable. If it means any such thing, then the ship never has any lien for freight, and must depend for her hire upon the continued solvency of the charterer. If, on the other hand, the clause means that the master only shall sign, then the ship has the security of the lien for freights until the bills of lading are signed, and has the freights themselves thereafter. (I am assuming for the moment with the shipper that the mutual "privileges" arise as soon as the ship lifts the cargo.) But it is perfectly apparent, I think, that the clause was in-

tended to protect the ship's hire against the charterer, and, if so, the shipper's construction would defeat its purpose.

[2] There being no express consent in the charter party, the shipper must show express or implied assent by conduct in pais which should amount to a waiver of this provision of the charter party. It is not uncommon in this port for owners to give express authority to the charterer to sign bills of lading and collect freight, but nothing in this case gives the least color to the assertion that the owners here gave any such authority. Indeed, Schoultz admits that the owners refused to charter the Maella to him, and, while he denies that it was because he had signed bills of lading in another case, Berg says that this was the reason, and Pattengill says that it was expressly stated when he got the charter party that the master only should sign. In the case of the other two vessels, the Vicomte and the Mona, chartered to Pattengill, like the Maella, Schoultz himself conceded that the master signed all bills of lading, and if forced to a decision I should not hesitate to find that there was no express or implied assent. The mere knowedge that the Caravel Steamship Company was the loading agent and advertised the ship would not tend in the slightest degree to put Berg on notice. But it is not necessary to make any such finding; the shipper has the burden of showing that the master under such a charter party authorized the charterer—here it was the charterer's loading agent—to sign, and it has not by any means carried that burden.

[3] Again, it is argued that the receipt of the goods estops the ship. The argument is that the master, at the time of receiving the goods over the rail, knows that, as he has not signed a bill of lading, some one else must have done so, and must have received the freight. Then is his time to refuse, and, if he does not, he ratifies all that the charterer has done. I know of no such practice, and the record is quite without any suggestion of its existence. But, if it be so, and if the result be as the shipper here contends, then a master can never with safety to his lien allow any cargo to come over the side without calling up the shipper to learn whether some intermeddler without authority may not have issued a bill of lading and collected freight on the parcel. But he has no right whatever to make the reception of the cargo conditional on anything of the sort. The charter party gives the charterer the right to consign what he wills to the ship, and the ship must take it, regardless of any agreements between the charterer and his shippers. Those are no affairs of the master; he looks only to his own contract, and the charterer could properly enough complain if he undertook any such inquisition into his dealings with shippers.

It may be, as I am assuming, that the master establishes a "privilege" against his ship by receiving any cargo; but, if so, it is measured by the charter party, not by some anonymous bill of lading which the charterer may have assumed to give in his name, and which may modify his fundamental rights as stipulated. It would be intolerable to charge him with all changes he did not run down and protest against. The bills of lading with which he is concerned come only when the cargo is laden and the freight is to be collected. In The Esrom (C. C. A.) 272

Fed. 266, 271, it was said obiter that the master ratifies any bill of lading signed by another as soon as he breaks ground, and that well may be because he must know by that time that no bills of lading have been signed, unless by the charterers, and that there is every probability that some have been given. The suggestion implicitly denies that there is any ratification at an earlier time, and for the reasons given there is at least in this record no warrant for any such holding.

[4] Finally, it is urged that there is a binding custom under which the charterer has authority to sign bills of lading and collect freight. No such custom is pleaded, as it should be; but I will not stand upon that. The question is whether the custom should be taken as an implied term of the charter party. No number of instances, and no practice, of the master's giving express authority to the charterer, would be relevant upon that issue. On the contrary, it would rather tend to show that express authority was thought necessary. The only proof which would count is that without express authority charterers commonly undertook to collect freights and sign bills of lading. There is no such proof; the most that can be said is that shippers frequently do not inquire whether any express authority has been given, especially when they are satisfied with the charterer's responsibility anyway. There might, perhaps, also be the basis for an estoppel, if, without proving that charterers had exercised the power without authority, the evidence did prove that it was universally granted in each case. Being charged with that knowledge, it might be plausible to argue that in signing a charter party an owner must be held to anticipate that shippers would assume he had given an express authority as was customarily done. But there is no proof of any such universal practice as should charge owners with that knowledge. It is not a light thing to convert a relation analogous to that of lessor and lessee, in which the parties act at arm's length into a relation of principal and agent. In so doing the lessor loses the protection of all the terms which he may rightfully exact and becomes chargeable generally. To do so through an estoppel, the proof ought to show pretty clearly that the supposed authority was a universal accompaniment of the agreement. There is no such proof here.

[5] In re Interocean Transportation Co., 234 Fed. 863, 148 C. C. A. 461, is a square decision that the charterer as such is not an agent to sign bills of lading or collect freight. There the shipper recovered from the charterer in bankruptcy freight money paid it upon a bill of lading issued for the master. The theory was that in representing itself as an agent of the master the charterer was guilty of a false statement, and that the money could be recovered on that ground. Obviously this could not have been held, if the charterer became an agent to collect and sign by virtue of the charter party. I cannot see that The Stornaway, 4 Asp. 529, has any bearing on the case.

The libelant may take a decree.